[Cite as *In re J.L-H.*, 2020-Ohio-3321.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2020-01-002 |
| J.L-H. | : | O P I N I O N<br>6/15/2020 |
| | : | |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 18-D000117

Sean Brinkman, 10 W. Monument Avenue, Dayton, Ohio 45402, for appellant

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

**M. POWELL, J.**

{¶ 1} Appellant, the mother of J.L.-H., appeals a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to Warren County Children Services ("WCCS").

{¶ 2} J.L.-H. was born at a Dayton, Ohio hospital on August 6, 2018, with Krabbe disease, a rare congenital disorder. The child was transferred to Nationwide Children's Hospital in Columbus which was experienced in treating this rare condition. Shortly after

birth, J.L.-H. underwent a bone marrow transplant to ameliorate the effects of the disease.

{¶ 3} On October 26, 2018, WCCS filed a complaint alleging that J.L.-H. was neglected and dependent. The complaint asserted that the child was due to be released from the hospital, but medical staff had contacted the agency and expressed concerns that the parents, despite repeated and detailed instruction by staff, were unable to demonstrate an ability to care for the child's medical needs. The complaint indicated that J.L.-H. requires constant and continual feedings with medication administration through a G-tube and not receiving these medications properly could be life-threatening.

{¶ 4} Emergency shelter care was granted to the agency and J.L.-H. was placed in a foster home. The trial court found the child dependent on January 2, 2019 and granted temporary custody to the agency. The agency prepared a case plan with reunification as the goal. When the parents failed to make sufficient progress, the agency filed a motion for permanent custody on October 8, 2019. The child's father appeared at the permanent custody hearing and indicated his consent to the agency's motion. After the hearing, the trial court granted permanent custody of J.L.-H. to the agency.

{¶ 5} Appellant now appeals the trial court's decision to grant permanent custody to the agency and raises the following assignment of error for our review:

{¶ 6} THE TRIAL COURT'S GRANT OF PERMANENT CUSTODY TO WCCS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 7} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11. The clear and convincing standard of proof requires such evidence that will "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re T.P.*,

- 2 -

12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 18.

{¶ 8} Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21.

{¶ 9} Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

{¶ 10} On appeal, appellant does not dispute the trial court's determination regarding the second part of the test. The court found that appellant had abandoned the child by failing to attend visitations for over three months and the record supports this finding. Instead, appellant argues that the court erred in determining permanent custody was in J.L.-H.'s best interest because the child had a relationship with appellant and permanent custody was not necessary for a legally secure placement when time extensions were possible.

{¶ 11} When examining whether a grant of permanent custody is in a child's best

interest, a juvenile court is required to consider all relevant factors, including, but not limited to, the following:

> (a)  The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ;
>
> (d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 12} In considering these best interest factors, "[t]here is not one element that is given greater weight than the others pursuant to the statute."  *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.  Moreover, the focus is on the *child's* best interest, therefore "[p]arental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights."  *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 13} In this case, the juvenile court made findings as to each of these factors.  First, the trial court found that the child is bonded with his foster parents and his needs are being met.  At the hearing, the caseworker testified that the child has been in the same foster home since his release from the hospital.  The home is a foster-to-adopt home with a mother, father and two children, one of whom has cerebral palsy.  Prior to the child's release

- 4 -

from the hospital, the foster parents were required to spend seven days of inpatient training at the hospital learning to care for the child.

{¶ 14} The trial court found that while appellant may feel a bond toward J.L.-H., no bond was observed between mother and the child. Visitation was arranged to take place at the child's bone marrow clinic appointments which are scheduled on a regular basis. The trial court found that appellant was more interested in taking pictures than being involved with the child. The trial court further found that appellant failed to have any contact with the child for over 90 days during the pendency of the case.

{¶ 15} With regard to the second factor, the court relied on the guardian ad litem assigned to the case. The court found that the guardian ad litem recommended the motion for permanent custody be granted. In considering the next factor, the trial court found that the child has been in the custody of the agency since the beginning of the case.

{¶ 16} In considering the child's need for a legally secure placement and whether a secure placement can be achieved without a grant of permanent custody, the court found that appellant is unable to meet the needs of the child. The court further found that she failed to remedy the conditions that resulted in the child's removal and is not able to be reunified with the child within a reasonable time. After a review of the record, we find the trial court's findings are supported by clear and convincing evidence.

{¶ 17} At the hearing, the caseworker and foster mother testified regarding the child's complex and frequent medical needs. J.L.-H. has several health complications that stem from Krabbe disease, including nerve pain, and adrenal insufficiency due to the overuse of steroids to treat graft-versus-host disease from his transplant. He has a floppy airway which causes aspiration and uses a feeding tube and a drain tube for gastric content. He is immune compromised and has a subdural hematoma, or brain bleed, as a side effect of steroids. He has global developmental delays.

{¶ 18} J.L.-H. takes 20 daily medications, given by syringe into a feeding tube, which are time sensitive because his body metabolizes them differently based upon the time of administration. He is treated with creams four times a day and takes a daily bath with medicated shampoos. The tubing, syringes, drain and feed bags must be washed, dried and sanitized after each use. J.L.-H. has oral stimulation to help with his feeding aversion. For motor development he is placed on the floor for "tummy time" 2-3 times a day for 20 minutes as tolerated and in an ExerSaucer as tolerated multiple times a day.[1] Every surface the child comes in contact with must be sanitized daily, including his crib and all hard surfaces. His crib linens must be changed, and floors vacuumed every day. Part of the foster parents' home has been adapted to provide for J.L.-H and the family's other special needs child, and includes a lift, hospital bed, hospital-grade shower and large cabinets for medical supplies.

{¶ 19} The foster mother testified that J.L.-H. requires around-the-clock care. She indicated the child does not sleep much and often goes 16 to 17 hours without sleeping due to nerve pain. The foster parents work together on different schedules to help offset each other and provide constant care. In addition, J.L.-H. has approximately 21 medical appointments per month, plus the foster mother meets with other entities that help manage aspects of the child's care and development. The foster mother is a stay-at-home parent and previously worked for Nationwide Childrens Hospital for eight years as an assistant to a general medical pediatric unit. The foster family lives about 12 minutes from Nationwide Children's Hospital and J.L.-H. has had four emergency admissions to the hospital since being placed in foster care.

{¶ 20} Appellant testified that she lives in HUD subsidized housing with her three-

---

1. An ExerSaucer is a large, round baby-containment device in which a child is placed upright. The device holds a child securely while allowing for some movement.

year-old son, who is a half-sibling to J.L.-H. At the time of the hearing, she indicated she has been working at Wendy's for three months and receives food stamps and Medicaid. She recently obtained her driver's license and a car. She testified that she is bonded with the child, but his half-sibling is not really bonded and shows jealousy. She stated that her mother is talking about moving from Georgia to help with caring for J.L.-H.

{¶ 21} Shortly after the child's birth, hospital staff was concerned about appellant's ability to care for J.L.-H.'s complex medical needs. A component of the case plan involved appellant participating and familiarizing herself with the child's medical needs. Visitations were scheduled during the child's bone marrow clinic appointments because these appointments were all encompassing with respect to the different areas of the child's care. The goal was for appellant to attend the clinics with the child and show that she could take care of him on her own. Early on, the appointments took place two to three times a week during inpatient treatment, then progressed to weekly clinics after discharge and are now monthly unless needed sooner.

{¶ 22} The caseworker testified that appellant was excited to see the child during visits, but was often preoccupied with taking pictures until staff limited picture-taking to the end of the visit. According to the caseworker, when the doctors were speaking, appellant was not truly listening to the doctor's explanations and not focusing on the complex information. Appellant did not ask any follow-up questions to aid in her understanding. The caseworker indicated that she had concerns with appellant's basic lack of understanding and several times appellant made comments that evidenced her lack of understanding regarding the child's condition.

{¶ 23} Overall, appellant has not demonstrated an ability to meet the medical needs of the child. She cannot communicate with the medical specialists and did not engage with the treatment team. The caseworker testified that while the treatment needs are complex,

they are not unattainable, and what appellant was asked to do as part of visitations was not as complex as it would be if she had the child in her care.

{¶ 24} In addition, the caseworker discussed concerns with appellant's ability to demonstrate parenting skills for both children at the same time. The caseworker had to discipline the child's half-sibling frequently and described instances such as spitting on the window, kicking, and kicking the bottom of the J.L.-H's bed. The caseworker also expressed concern regarding appellant's lack of understanding regarding the need for sanitation, which is critical to J.L.-H.'s safety. Appellant brought the half-sibling to clinic visits while sick and J.L.-H. became sick after these visits. Appellant's home was described as "pretty messy," with food on the floors and walls, and the home smells of smoke. While the agency felt the lack of cleanliness in the home is not a major problem for the half-sibling, the lack of a sanitary environment would be detrimental to J.L.-H.

{¶ 25} After reviewing the record, we find the trial court's determinations were supported by clear and convincing evidence. While appellant made some progress on the case plan by obtaining her driver's license and an automobile, no progress was made regarding the issues that led to the child's removal. There was no progress toward the critical aspects of the case plan, namely demonstrating an ability to care for the child with his extensive medical needs.

{¶ 26} Appellant's primary argument on appeal is that the trial court should have granted an extension of time to allow her more time to work toward reunification. However, the child had been in agency custody for nearly a year before the motion for permanent custody was filed, and by the time of the hearing, the child was 16 months old. During this time, appellant made little progress toward the case plan, and no progress on the critical aspects. Nothing in the record indicates an extension of time would have allowed appellant to safely care for the child in the near future. Appellant had 16 months and was still unable

to demonstrate an understanding of the child's condition and his complex medical needs, much less demonstrate an ability to safely meet those needs. Accordingly, appellant's assignment of error is overruled.

{¶ 27} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.