[Cite as *In re B.O.*, 2024-Ohio-1732.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE:                              :

       B.O., et al.                   :        CASE NOS.    CA2023-11-102
                                                        CA2023-11-104
                               :                              CA2023-11-105
                                                          CA2023-11-106
                               :                              CA2023-11-107

                               :

                               :                   O P I N I O N
                                                5/6/2024

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
CASE NOS. 22-D000003; 22-D000004; 22-D000005; 22-D000006

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten Brandt, Assistant Prosecuting Attorney, for appellee.

Mark W. Raines, for appellant, Mother.

KL Hurd Law, LLC, and Kenyatta Hurd, for appellant, Father.

CASA, and Brooke L. Logsdon, guardian ad litem.

**M. POWELL, J.**

{¶ 1} Appellants, the biological mother and father of B.O., A.O., H.O., and C.O.,

appeal from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of their children to appellee, Warren County Children's Services ("the Agency").[1]  For the reasons discussed below, we affirm the juvenile court's decision.

**The Parties**

{¶ 2}   As set forth above, the four children subject of this appeal are: B.O., born on May 18, 2010; A.O., born on May 1, 2014; H.O., born on May 13, 2019; and C.O., born on March 3, 2021.  At the time of the permanent custody hearing, appellants had been married for more than 15 years; however, Mother intended to file for a divorce from Father due to his mental health problems.  Both Mother and Father are admitted cocaine users who have struggled to maintain any stability since the children's removal from Mother's care.  At the time of the permanent custody hearing, Father was incarcerated in the county jail after failing to comply with the conditions of his intervention in lieu of conviction ("ILC").  According to Father, he was granted ILC after he was charged with felony possession of cocaine and faced 11 months in jail if he was found guilty of the felony charge.

{¶ 3}   Due to positive drug screens and a lack of cooperation with the Agency, appellants' visitation with the children was suspended and was never reinstated.  As a result, neither Mother nor Father had seen the children since March 10, 2023.  At the time of the permanent custody hearing, A.O., H.O., and C.O., lived together in a foster home and B.O. lived with a family friend.  The children are doing well in their placements, although B.O. has faced some challenges due to the separation from his siblings.  The families with whom the children are placed intend to adopt the children if permanent

---

1. Pursuant to App.R. 3(B), we sua sponte consolidate these appeals for purposes of writing this single opinion.

custody is granted to the Agency.

## Facts & Procedural History

{¶ 4} The Agency became involved with the family in 2020 after learning the family's housing was unsafe and that Father had been using drugs in front of the children. At that time, Mother and Father tested positive for cocaine, and agreed to pursue a START case with the Agency. The START case did not require court involvement, and was a voluntary case focused on substance abuse. The case was successfully closed in December 2020, when Mother was pregnant with C.O.

{¶ 5} Approximately 13 months later, on January 24, 2022, the Agency filed complaints alleging the children were dependent. The complaints stemmed from an altercation in the home, during which Father threatened physical harm to everyone in the family while wielding a butcher knife. The complaints alleged that during the altercation, Father stabbed holes in the wall, punched a hole in the wall, and spit on Mother. Father also threatened Mother and the children that, if they called the police, they would "leave in a body bag." The police were called and Father was arrested.

{¶ 6} Upon Father's release, Mother rejected the Agency's recommendation that she seek a protection order restraining father from having contact with her or the children. According to Mother, she refused to obtain any order to protect herself or her children from Father at that time because she had been married to Father for 15 years and was not afraid of him. The Agency found this concerning given the violent threats Father made toward Mother and the children.

{¶ 7} After an emergency shelter care hearing, the juvenile court placed the children in the protective supervision of the Agency and appointed a Court Appointed Special Advocate ("CASA") for the children. The Agency implemented an in-home safety

plan where the children remained in Mother's custody while she and Father engaged in case plan services. The safety plan required Father to move out of the marital home and prohibited any unsupervised contact between Father and the children. Although the Agency hoped that Mother's capacity to protect the children could be increased after engagement in case plan services, the safety plan did not identify Mother as an appropriate supervisor for Father. The safety plan was disrupted when Mother allowed Father around the children without a supervisor and Father was arrested from the family home on two occasions. According to Mother, she needed Father because she had no other help, and she wanted her children to have a relationship with him.

**{¶ 8}** In March 2022, the children were adjudicated dependent. After a dispositional hearing on April 14, 2022, the children remained in Mother's custody with the protective supervision of the Agency.

**{¶ 9}** Thereafter, in July 2022, while the children were in Mother's custody, an Agency caseworker discovered Father in the home with Mother and the children. There were multiple empty bottles of whiskey in the home, including two that were within reach of the children. Father refused a drug screen and was very threatening and acted aggressively toward the caseworker, Mother, and the children. Father fled the home after the caseworker indicated she planned to call the police. The following day, Father informed the caseworker that Mother had been using drugs. Mother ultimately submitted to a drug screen, which was positive for cocaine.

**{¶ 10}** As a result of the above, the children were removed from Mother's care and the juvenile court granted temporary custody of the children to the Agency on July 13, 2022. The oldest child, B.O., was placed in the home of a neighborhood friend, while the younger three children were placed with maternal grandmother. Due to maternal

grandmother's inability to meet the needs of the younger three children, the children were removed from her care less than one month later and together placed in a foster home.

{¶ 11} After the children's removal from Mother's care, the Agency implemented an amended case plan with a goal of returning the children to the parents' care. The amended case plan required Mother and Father to, among other things, make themselves available to the Agency; submit to a mental health and drug and alcohol assessment and follow all recommendations; attend parenting classes; provide for their basic needs; and submit to random drug screens. The amended case plan also required Mother to complete domestic violence education and for Father to complete a batterer's intervention program.

{¶ 12} In May 2023, the Agency moved for permanent custody of the children, alleging that the children could not be placed with their parents within a six-month period and that an award of permanent custody to the Agency was in the best interests of the children. The matter was set for a hearing on August 21, 2023, however, due to the inability to perfect service upon Father, it was continued until October 23, 2023. Father was incarcerated at the time of the rescheduled hearing but was permitted to attend and testify via telephone. The juvenile court also heard testimony from Mother and an Agency caseworker.

{¶ 13} The Agency caseworker testified that she had been providing ongoing services to the family since February 2022. Throughout the case, Mother completed several of her case plan objectives, including taking parenting classes and domestic violence classes, as well as engaging in mental health counseling. Notwithstanding Mother's progress in some areas of her case plan, the Agency remained concerned with Mother's substance abuse throughout the case and her continued indifference to Father's

threatening behavior.

{¶ 14} Regarding the parents' substance abuse, the Agency was initially concerned with Father, as Mother had no diagnoses or recommendations related to substance abuse after her assessment at Talbert House. This changed in July 2022 when Mother tested positive for cocaine and later made concerning comments regarding her alcohol use. Thereafter, in November 2022, the Agency learned that Mother had overdosed on fentanyl. Mother claimed the overdose was "accidental," and that her friend "gave [her] the wrong thing," when she gave Mother fentanyl instead of Tylenol. Mother was taken to the hospital and declined to release her records to the Agency. After investigating the situation, the caseworker learned that Mother and Father had been associating with known drug users and that Mother was using cocaine prior to her overdose.

{¶ 15} After her overdose, the Agency's concerns regarding Mother's substance abuse continued to increase. Mother was reassessed at Talbert House where they added alcohol use disorder to her diagnoses and recommended treatment. According to Mother, the diagnosis stemmed from her admission that she liked to have a drink "every once in a while," meaning three or four times a month. Around this time, December 2022, Mother began refusing multiple drug screens, did not disclose the extent of her cocaine use, and was difficult to contact.

{¶ 16} In January 2023, Father suffered a heart attack. The caseworker testified that, at that time, things "went off the rails" with Mother, Father, and the Agency. The caseworker explained that, in the months following Father's heart attack, neither Mother nor Father submitted to drug screens, were available or responsive to the Agency, or provided records to the Agency. In April 2023, Mother admitted to using cocaine with

Father after he "bullied" her to use with him.

{¶ 17} Beginning in May 2023, the caseworker testified that Mother and Father "f[e]ll off the map." The caseworker could not reach Mother or Father and was unsure of their whereabouts at that time. Eventually, in July 2023, the caseworker made contact with Mother through Facebook after informing Mother that the case was moving toward a permanent custody trial. At that point, Mother responded that Father had graduated from treatment, and they were both working at Frisch's.

{¶ 18} The caseworker attempted to meet with Mother and Father to complete a drug screen but was unable to do so until August 2023. Between August 2023 and September 2023 Mother consistently tested positive for cocaine. Mother claimed all the positives were from a single use of cocaine in mid-August. The caseworker testified that she discussed Mother's theory with Forensic Fluids, who did not agree with Mother, and informed the caseworker that such a number of positives over such a long time period would require more than a single use one month previously. The caseworker later obtained a negative drug screen for Mother on October 4, 2023, just 19 days before the permanent custody hearing.

{¶ 19} Regarding Father, the caseworker testified that, although Father had completed some requirements of his case plan, he was incarcerated at the time of the hearing, had no housing, no employment, and had recently relapsed. The caseworker testified that Father was difficult to communicate with throughout the case, and because of those difficulties, she had only administered three drug screens for Father. Each of those screens was positive for cocaine. Father also failed to follow up with the recommendations of his mental health assessment.

{¶ 20} The caseworker also discussed Mother's and Father's lack of visitation with

the children throughout the case. After the children's removal from Mother's care, Mother and Father had supervised visitation with the children for two hours, once a week. The parents initially attended visitation with the children consistently and interacted in a "generally positive" manner with the children. Around the time of Mother's overdose, the parents' visitation was slightly restricted after Father became threatening toward the children's foster parents, including making statements that he had located their home on Google and was aware of what vehicle they drove. These restrictions were intended to prevent any interaction between Mother, Father, and the foster parents.

{¶ 21} The parents' visitation never progressed beyond the two-hour weekly visit and was ultimately suspended in March 2023. The caseworker testified their visitation was suspended after Mother refused four drug screens; Father refused three drug screens; they refused to provide any documentation relating to Father's recent hospitalization and discharge; and they cancelled visits at the last minute for reasons like, "[Father] has to do laundry." According to the caseworker, the missed visits were upsetting for the children. The caseworker informed the parents that, in order to have their visitation reinstated, the Agency required clean drug screens, for the parents to stabilize, and to re-engage with the Agency. The parents' visitation was never reinstated.

{¶ 22} The caseworker testified that neither Mother nor Father had remedied the conditions which caused their children to be removed from their care. As such, the caseworker believed that granting permanent custody of the children to the Agency was in the children's best interest. Regarding Mother, the caseworker testified that overall, Mother had not demonstrated a commitment to working on the case plan requirements. Mother continued to downplay Father's threats to kill her family, and minimized her cocaine use and drinking problem. Mother's biggest impediment, according to the

caseworker, was herself. The caseworker testified that Mother remained unable to be honest with her issues, absent which the Agency could not make the situation safe for the children. The caseworker was particularly concerned that Mother refused to accept any accountability for the children's removal and would not separate from Father. Although Mother indicated she was done with Father, the caseworker struggled to believe Mother based on the history of the case.

{¶ 23} Regarding Father, the caseworker testified that he had not maintained sobriety for any length of time and failed to demonstrate any awareness of the Agency's concerns. Instead, Father consistently gave excuses for his missteps. The caseworker testified Father has no willingness to change or address his or Mother's problematic behavior, and like Mother, had not demonstrated a commitment to reunifying with his children.

{¶ 24} During Mother's testimony, she discussed her progress on her case plan requirements. Regarding employment, Mother was employed at Frisch's until August 2023 when she was terminated due to staffing issues. Mother started a new job the week before the permanent custody hearing, however, her employer was unaware of her recent positive screens or past drug use.

{¶ 25} Mother testified she did not have suitable housing for the children, but that her caseworker was helping her complete applications for housing. After losing her home in July 2022, Mother and Father lived in a hotel room until the room became too expensive. After leaving the hotel room, Mother and Father lived in Father's van. After Mother's termination from Frisch's, she moved into a friend's condo in Mason while Father was in jail. The condo housed six adults, all of whom had not been identified to the Agency and did not want to be involved with Mother's ongoing case.

{¶ 26} Mother discussed her refusal of several drug screens, which she attributed to her job and the fact that her phone was off at times. After refusing screens throughout February and March 2023, Mother admitted to cocaine use in April 2023. When asked about the caseworker's inability to locate Mother for screens in May, June, July and early August 2023, Mother testified the caseworker "knew [Mother] was at the hotel" and that "[the caseworker] knew where [Mother] worked."

{¶ 27} Despite acknowledging that she could lose her children as a result of the permanent custody hearing, Mother testified she used cocaine on August 15, 2023, less than one week before the initial permanent custody hearing date. Mother proceeded to test positive for cocaine on August 17, 21, and 25, 2023. Mother also tested positive on September 15 and 21, 2023. Mother claimed each of the foregoing positives stemmed from a single use on August 15, 2023, and noted "that was the first time [she] had used in a while, so."

{¶ 28} As part of Father's testimony, he discussed his progress throughout the case. Despite Father's testimony that he had completed the requirements of his case plan, he later acknowledged that he had not secured housing or employment by the time of the permanent custody hearing and was still using illegal substances. Regarding housing, Father and Mother were living "off and on" out of his van. Father testified that the children could not live out of a van, but, in "today's economy," it was very hard to get a house.

{¶ 29} Regarding his mental health and substance abuse, Father testified he was initially diagnosed with bipolar disorder and severe alcohol use. Father's diagnoses were updated twice in 2022 to include generalized anxiety disorder and cocaine use disorder. Father participated in more than 10 dual treatment programs throughout the case, several

of which he had successfully completed, including one program in July 2023.

{¶ 30} Notwithstanding his completion of numerous treatment programs, Father testified he became depressed after his heart attack in January 2023, which led him to use cocaine again. Father admittedly "messed up" and used again in early October 2023, and had used cocaine as recently as the Thursday prior to the hearing. Father explained during his testimony that "most of the time [he] tried to be dirty" when he entered certain treatment facilities because, if someone is clean, the facility "won't let you in." Additionally, Father claimed that his drug use throughout the case was linked to his anxiety, and that relapse is a part of recovery.

{¶ 31} Father blamed his missteps on the heart attack he suffered in January 2023, in addition to his various incarcerations and rehab stays since then. Although Father acknowledged he knew he could not have the children, he believed they should be placed with Mother. According to Father, he was Mother's "downfall."

{¶ 32} After receiving the foregoing testimony, the juvenile court noted, on the record, that the CASA had filed a report and was present during the hearing. The parties declined to question the CASA, but counsel stated on CASA's behalf that it believed granting permanent custody to the Agency was in the children's best interest.

{¶ 33} On November 2, 2023, the juvenile court issued a decision granting permanent custody of the children to the Agency. Mother and Father separately appealed, each raising one assignment of error. This court consolidated the appeals for review and disposition.

### Two-Part Permanent Custody Test

{¶ 34} Before addressing the specific arguments raised on appeal, we will discuss the applicable standard of review. Pursuant to R.C. 2151.414(B)(1), a juvenile court may

- 11 -

terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12; *In re H.G.*, 12th Dist. Butler No. CA2023-06-069, 2023-Ohio-4082, ¶ 58.

{¶ 35} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the above statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance

of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 36} "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.'" *In re E.V.*, 12th Dist. Clinton No. CA2023-09-018, 2024-Ohio-192, ¶ 25, quoting *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, ¶ 11. Although not explicit, Mother and Father argue the juvenile court's decision finding it was in the children's best interest to grant the Agency's motions for permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 37} Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re L.B.*, 10th Dist. Franklin Nos. 19AP-644 and 19AP-645, 2020-Ohio-3045, ¶ 29.

{¶ 38} In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court

"'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15.

{¶ 39} Regarding the second part of the two-part permanent custody test, the juvenile court determined that the children had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d) and that the children could not be placed with Mother or Father within a reasonable time or should not be placed with either of them pursuant to R.C. 2151.414(B)(1)(a). Neither Mother nor Father contest these determinations and instead focus their arguments on the juvenile court's best interest determination under R.C. 2151.414(D). Although the parents do not challenge the juvenile court's determination that the children had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period, we decline to resolve this appeal on that basis because the motion did not allege as a basis for permanent custody that the children had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period.

{¶ 40} As indicated above, only one of the findings under R.C. 2151.414(B)(1)(a) to (e) must be met to satisfy the second prong of the two-part permanent custody test. *In*

*re J.L-H*, 12th Dist. Warren No. CA2020-01-002, 2020-Ohio-3321, ¶ 8.  Accordingly, the juvenile court's finding that the children cannot be placed with Mother or Father within a reasonable period of time or should not be placed with Mother or Father is another statutory basis upon which the juvenile court may appropriately award permanent custody to the Agency.  *In re M.K.,* 12th Dist. Preble No. CA2011-07-003, 2012-Ohio-36, ¶ 64. Because neither parent challenges on appeal the juvenile court's finding that the children cannot be placed with them within a reasonable period of time or should not be placed with them, we affirm the juvenile court's decision with regard to the second part of the test without conducting any further analysis.  *See In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 66.

{¶ 41} We now turn our focus to what is actually in dispute on appeal; that being, whether the juvenile court's decision to grant permanent custody of the children to the Agency was in the children's best interest.

**Mother's Appeal**

{¶ 42} Mother raises the following assignment of error:

> THE TRIAL COURT'S DECISION TO GRANT WARREN COUNTY CHILDREN'S SERVICES PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 43} As noted above, Mother argues the juvenile court erred in determining an award of permanent custody to the Agency was in the best interest of the children.

{¶ 44} The first part of that two-part permanent custody test requires the juvenile court to find the grant of permanent custody to be in the children's best interest.  *In re D.K.W.*, 2014-Ohio-2896 at ¶ 21.  This is generally done by utilizing the best-interest factors set forth in R.C. 2151.414(D)(1).  *In re S.W.*, 12th Dist. Preble Nos. CA2022-08-013 and CA2022-08-014, 2023-Ohio-118, ¶ 19.  These factors include, but are not limited

- 15 -

to: (1) the interaction and interrelationship of the children with the children's parents; (2) the wishes of the children, as expressed directly by the children or through the children's guardian ad litem; (3) the custodial history of the children; and (4) the children's need for a legally secure permanent placement. R.C. 2151.414(D)(1)(a)-(d). These factors also include whether any of the circumstances listed in R.C. 2151.414(E)(7) to (11) apply. *In re G.A.*, 12th Dist. Clermont No. CA2022-11-079, 2023-Ohio-643, ¶ 41, citing R.C. 2151.414(D)(1)(e).

{¶ 45} Mother first argues the juvenile court erred in finding it was in the children's best interest to grant permanent custody to the Agency because R.C. 2151.414(D)(1)(a) and (b) weigh heavily against terminating Mother's parental rights. Specifically, Mother claims the Agency failed to present evidence of the impact severing the relationship with Mother would have on the children. In support, Mother cites a case from the Ninth District Court of Appeals where the court reversed a grant of permanent custody. *In re A.W.*, 9th Dist. Lorain No. 09CA009631, 2010-Ohio-817. In *A.W.*, the court of appeals reversed after finding a "paucity" of evidence demonstrating that permanent custody was in the child's best interest. *Id.* at ¶ 12. The court observed that most evidence in the record weighed towards preserving the family relationship. *Id.* at ¶ 14.

{¶ 46} *A.W.* is distinguishable. Here the juvenile court considered the CASA's report, which discussed the children's bond with Mother and states that B.O. and A.O. would like the family to be together, while H.O. "clearly wants his Mother and Father." There was also testimony presented that described the stress B.O. felt while living away from his siblings and that A.O. misses and loves her family. The juvenile court weighed this evidence against other, substantial, evidence in the record that Mother could not commit to the case plan's reunification requirements and had "all but abandoned the

children" since March 2023. The record reflects Mother was aware that the reinstatement of her visits was conditioned upon negative drug screens, but Mother continued to use cocaine and minimize that use until October 2023, the month of the rescheduled permanent custody hearing. As a result of her noncompliance, Mother could not visit her children for several months.

{¶ 47} Even though three of the children expressed their desire for reunification of the family, R.C. 2151.414(D)(1)(b) is but a single best interest factor to be considered and weighed in conjunction with the other factors. By the time the permanent custody motion had been filed, the children had been in placement for approximately ten months, the parents had gone months without contact with the children, had failed to address their substance abuse issues, and did not have housing appropriate for the children. The Agency had been involved with the family in one way or another since 2020 and despite Agency efforts to maintain the children in the home during the pendency of the case, their removal became necessary due to Mother's failure to protect the children from having contact with Father. Despite wanting to return home, the children are doing well in their placements with families who would adopt them and provide them with a permanent home should permanent custody be granted. Thus, allowing for the children's wishes for reunification, the totality of the evidence clearly and convincingly supported permanent custody.

{¶ 48} Mother also argues that this case is comparable to one where this court reversed a decision granting permanent custody to a family services agency. *In re Knuckles*, 12th Dist. Butler Nos. CA2003-01-004 and CA2003-01-005, 2003-Ohio-4418. In *Knuckles* the lower court granted permanent custody largely because the parents failed to attend visits with their children and failed to complete case services. *Id.* at ¶ 21, 25.

This court reversed, finding that the record revealed that the parents did not attend visits or complete case services because of transportation issues. *Id.* at ¶ 26. The record further reflected that the agency failed to assist the parents with their transportation needs. *Id.* at ¶ 27. The visits the parents could attend demonstrated that the family was well-bonded. *Id.* at ¶ 23. In sum, we found that the record did not clearly and convincingly demonstrate that the parents could not provide their children with a legally secure placement. *Id.* at ¶ 33.

{¶ 49} In this case, however, the record established that Mother failed to resolve many of the issues that led to the children's removal and that the Agency did provide necessary assistance to Mother to help her resolve those issues. The evidence at the hearing was that the Agency worked with Mother on her case plan services, but Mother's dedication to reunifying with the children decreased as the case progressed. After Father suffered a heart attack in January 2023, Mother became completely uncooperative with the Agency and stopped communicating with her caseworker regarding the Agency's concerns. This was despite the extensive efforts taken by the caseworker to stay connected with Mother and Father throughout the case.

{¶ 50} We also disagree with Mother that her completion of some case plan services "shows she can provide a permanently secure permanent placement for her children soon." We note that it is well established that the completion of certain case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 12th Dist. Brown Nos. CA2002-05-011 and CA2002-07-014, 2002-Ohio-7278, ¶ 13. Instead, a case plan is merely a means to a goal and not a goal in itself. *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 35.

{¶ 51} Here, despite Mother's assertion that she is progressing in her drug and

alcohol treatment, as well as her mental health treatment, and is allegedly no longer in a relationship with Father, serious concerns remained at the time of the hearing. The caseworker testified that Mother was recommended to mental health treatment to support her in her relationship with or separation from Father. This included learning to hold Father accountable for his anti-social behavior. During her testimony, Mother claimed she planned to file for divorce from Father due to his mental health, but nonetheless continued to minimize his behavior throughout the case. The evidence also revealed that Mother consistently prioritized Father's medical treatment over her case plan services and would cancel visits with the children if Father was unavailable. When considering the testimony offered at trial, Mother has not shown that she takes the Agency's concerns seriously or has learned to hold Father accountable for his actions. This evidence reflects that Mother lacks the capacity to protect herself and the children from Father.

{¶ 52} Concerning Mother's recent progress in her drug and alcohol treatment, the testimony at the hearing established that Mother had only recently tested negative for illegal substances and was prone to relapsing. Mother also has had difficulty admitting the severity of her cocaine use, thus raising the very real possibility that Mother may relapse again. These children's lives are not an experiment that can be left to chance. *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 39. That is, stated differently, "'[t]he law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm.'" (Internal brackets omitted.) *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30, quoting *In re R.S.-G.*, 4th Dist. Athens No. 15CA2, 2015-Ohio-4245, ¶ 53.

{¶ 53} Despite opportunities to do so, Mother has not shown over the history of the

case that she is committed or able to care for and protect the children. Based upon the evidence presented at the hearing, it is clear that Mother's substance abuse problem, lack of commitment to the case plan, and failure to put her children's needs ahead of her own and Father's prevented Mother from providing the children with a safe and stable permanent living environment. Even after the Agency's initial involvement in 2020, Mother has continued to place herself in unsafe situations, primarily by turning to illegal substances and refusing to separate from Father. As this court has previously recognized, "[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.G.*, 12th Dist. Warren No. CA2020-10-070, 2021-Ohio-1000, ¶ 44. The juvenile court's decision to grant permanent custody of the children to the Agency provides this for the children. Accordingly, we find the juvenile court's decision is not against the manifest weight of the evidence and is therefore supported by sufficient evidence. Mother's assignment of error is overruled.

**Father's Appeal**

{¶ 54} As noted above, Father also appeals from the juvenile court's decision and raises the raises the following assignment of error:

> THE TRIAL COURT'S DECISION TO TERMINATE THE PARENTS' PARENTAL RIGHTS WAS NOT PROVEN BY CLEAR AND CONVINCING EVIDENCE.

{¶ 55} Like Mother, Father argues the juvenile court erred in determining it was in the children's best interest to award permanent custody to the Agency. In support, Father claims that he and Mother are bonded with the children; the juvenile court did not fully consider the wishes of the children; and that because Mother had completed a majority of her case plan services, an award of permanent custody to the Agency was not necessary.

{¶ 56} Regarding the weight given to the children's bond with their parents, Father argues the testimony at the hearing shows he and Mother have a history of taking care of the children and are bonded with them. Therefore, Father claims this factor weighs in favor of Mother and Father. Contrary to Father's claims, the testimony at the hearing revealed that Mother and Father struggled to meet the children's various academic, behavioral, and medical needs prior to their removal, and that during the case, Mother refused to approve necessary medical intervention for H.O. without court involvement. Mother and Father had not visited with the children since March 2023, which prevented expanded or unsupervised visitation, as well as any opportunity for Mother and Father to demonstrate their current abilities to care for the children. Father also described his bond with B.O. as complicated, and that he had made a lot of mistakes with his oldest child. Nonetheless, even if Mother and Father share a strong bond with the children, it is well settled that simply because a child is bonded with his or her parents does not render an award of permanent custody to a children's services agency against the child's best interest. *In re R.B.*, 12th Dist. Warren No. CA2023-03-032, 2023-Ohio-3145, ¶ 21.

{¶ 57} Father next argues the juvenile court erred when it solely relied on the recommendation of the CASA without addressing the wishes of the children in its opinion. We note that R.C. 2151.414(D)(1)(b) "unambiguously gives the [juvenile] court the choice of considering the child's wishes directly from the child or through the guardian ad litem." *In re C.F.*, 113 Ohio St. 3d 73, 2007-Ohio-1104, ¶ 55. Here, the CASA filed a written report and orally recommended permanent custody to the Agency at the hearing. As discussed in Mother's appeal, the CASA's report specifically notes the children's individual wishes. Thus, we disagree with Father's claim that the juvenile court did not address the children's wishes, as it is evident the juvenile court considered the children's

wishes as expressed through the CASA, including that the older three children wished to return home.

{¶ 58} Turning to Father's final argument, that Mother had largely completed her case plan services and was capable of reunifying with the children at the time of the hearing, we disagree with Father's interpretation of the evidence. As discussed above in Mother's appeal, the bulk of the evidence presented at the hearing established that, although Mother had completed some of her case plan services, she failed to remedy the conditions that initially led to the children's removal. At the time of the hearing, Mother continued to struggle with her sobriety, did not have suitable housing for the children, and was inconsistent with her treatment providers and the Agency throughout much of the case. Mother neglected to prioritize her visitation or reunification with the children, and instead, focused on her relationship with Father and his medical and legal ailments.

{¶ 59} Father has likewise failed to remedy the Agency's concerns that led to the children's removal. As testified by the caseworker, the record reveals that Father has largely failed to demonstrate any awareness of or accountability for the Agency's concerns. Despite completing several treatment programs, Father failed to maintain sobriety for any length of time and was incarcerated multiple times throughout the case as a result. At the time of the hearing, Father was in jail, but was unemployed and living out of his van prior to his most recent incarceration. Father has not demonstrated any commitment to reunifying with his children or changing his habits. Instead, Father acknowledged during the hearing that he was the biggest impediment to Mother, and that, although the children could not be placed with him, they should be placed with Mother.

{¶ 60} Per Mother's own testimony, she was aware that she still had "a lot to do with the case plan and stuff," but was "willing to keep doing that." Notwithstanding

Mother's assertion that she could, eventually, be a suitable parent for the children, a parent "'is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal.'" *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32, quoting *In re L.M.*, 11th Dist. Ashtabula No. 2010-A-0058, 2011-Ohio-1585, ¶ 50. The Agency has most recently been involved with the children since early 2022. Thus, at the time of the permanent custody motions, Mother and Father had been given approximately 16 months to remedy the Agency's concerns. Mother and Father have failed to demonstrate that they can provide a safe and stable environment for the children. It is not in the children's best interest to gamble on the possibility that their parents may be able to obtain stability in the future. This is especially true where the children are now thriving in stable and secure environments.

{¶ 61} Based on the above, we find no merit to any of the arguments raised herein by Father. The juvenile court's decision to grant permanent custody was supported by clear and convincing evidence and was otherwise not against the manifest weight of the evidence. Father's assignment of error is overruled.

## Conclusion

{¶ 62} Mother and Father both contest the juvenile court's decision that the children's interests were best served by placing them in the permanent custody of the Agency. For the reasons set forth above, we find Mother's and Father's arguments to be without merit, and the judgment of the trial court is affirmed.

{¶ 63} Judgment affirmed.

BYRNE, P.J., and PIPER, J., concur.

- 23 -