[Cite as *In re V.T.*, 2026-Ohio-11.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| IN RE: | : | CASE NO. CA2025-07-017 |
| | | CA2025-07-018 |
| V.T., et al. | : | |
| | : | |
| | : | OPINION AND |
| | | JUDGMENT ENTRY |
| | : | 1/5/2026 |
| | : | |

APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
CASE NOS. AND20230129; AND20230130; AND20230131

Sabol Law Office, and Garry A. Sabol, for appellant, mother.

Steven H. Eckstein, for appellant, father.

Jess C. Weade, Fayette County Prosecuting Attorney, and Rachel S. Martin, Assistant Prosecuting Attorney, for appellee.

Kristina Walkowicz, guardian ad litem.

## O P I N I O N

**M. POWELL, J.**

{¶ 1} Appellants, Mother and Father, appeal from a decision of the Fayette County Court of Common Pleas, Juvenile Division, terminating their parental rights and granting permanent custody of their children to appellee, Fayette County Children Services ("the agency").[1] For the reasons discussed below, we affirm the juvenile court's decision.

### I. Factual and Procedural Background

### A. The children's removal

{¶ 2} V.T., M.T., and C.T. (born in 2016, 2018, and 2020, respectively) are the biological minor children of Mother and Father. On March 23, 2023, the agency removed all three children from Mother's custody after receiving reports of concern.

{¶ 3} The circumstances that led to this removal were grim. The agency had attempted several home visits during which Mother would not wake up. Even then, before formal custody proceedings began, the agency had already implemented a voluntary case plan with Mother. She failed to comply. Mother continued to test positive for cocaine and oxycodone. She failed to renew her SNAP benefits, neglected to ensure the oldest child attended school, declined to obtain a substance-abuse assessment when requested, allowed a known drug dealer into the home, and faced eviction. Father said no when asked whether he could take custody of the children, explaining that his living situation would not allow it and he could not pass a drug screen.

---

1. We sua sponte consolidated these appeals. App.R. 3(B).

{¶ 4} The juvenile court adjudicated the three children as dependent children on June 13, 2023. The children were placed in the agency's temporary custody and have resided in the same foster home since June 2023.

**B. The Case Plans**

{¶ 5} Following the dependency adjudication, the agency developed case plans for both Mother and Father with a goal of reunification. The requirements were straightforward. Mother's case plan required her to obtain and maintain employment and provide proof of income, obtain county benefits, obtain and maintain suitable housing and provide proof of lease, undergo mental-health and drug-and-alcohol assessments and follow through with recommended counseling, take a parenting class, comply with random drug screens, and engage in supervised visitation with the children.

{¶ 6} Father's case plan required him to attend parenting classes, complete a mental-health assessment and follow any recommendations, complete a drug-and-alcohol assessment and follow any recommendations, obtain and maintain legal income and provide paystubs, and obtain and maintain housing.

{¶ 7} The agency gave both parents multiple extensions of these case plans to allow additional time for compliance. Despite these extensions, the parents' progress remained, at best, incomplete.

{¶ 8} The agency filed its motion for permanent custody on July 11, 2024. The matter first came on for hearing on September 30, 2024, but was continued to allow for the appointment of counsel for Father. On October 29, 2024, all parties stipulated to a further continuance to allow Mother and Father even more time to work on their case plans. The parties waived the statutory 120-day deadline for the permanent-custody hearing.

- 3 -

{¶ 9}  The permanent-custody hearing was eventually resumed on January 16, 2025, and March 28, 2025. The juvenile court heard testimony from the children's appointed guardian ad litem ("GAL"), the caseworker, the case supervisor, Mother, Father, and Mother's counselor from Autumn Behavioral Health.

{¶ 10} The paternal grandfather filed a motion for custody and appeared at the January 16, 2025 hearing. He was notified in open court of the next hearing date but failed to appear on March 28, 2025. The agency indicated that it would not consider him for placement.

## C. Mother's Case-Plan Progress

{¶ 11}  Mother was given two years to demonstrate she could provide a safe, stable home for her children. The record shows she spent most of that time failing, equivocating, or arriving late.

{¶ 12} By the time of the final permanent-custody hearing, Mother had cycled through five different treatment centers for substance abuse. She had been consistent in treatment for only two months as of the final hearing date. She failed to comply with the agency's request for weekly random drug screens until after the first permanent-custody hearing in September 2024. As recently as October 2024, she tested positive for drugs.

{¶ 13}  Mother did not provide proof of income at the first two hearing dates. She did not provide verification of her residence until March 28, 2025, the final day of the permanent-custody hearing. She lives in a home where a man named Mr. Stone also resides. The nature of the relationship between Mother and Mr. Stone remains unclear. The agency requested that Mr. Stone undergo a background check, and he refused to comply.

{¶ 14} Mother testified that she completed a mental-health assessment, but she

never provided documentation of it to the agency. She testified that she did not know the results of the assessment, did not know the recommendations, and was not currently receiving mental-health counseling. She stated she did not believe she needed such counseling. Mother presented her parenting-class certificate to the caseworker on the morning of the final day of the permanent-custody hearing.

{¶ 15} Mother's housing plans remained wholly unsettled. She testified that she "didn't know" whether she might move in with Father in the future. If she did move, she had no plan for employment, no plan for childcare, and did not know the consequences of breaking her current lease. As the juvenile court found, her "plans remained up in the air."

{¶ 16} Mother's counselor from Autumn Behavioral Health testified that Mother had "made great strides" in treatment and that she believed the children would be safe if placed with Mother. But the caseworker's testimony told a different story: a two-year pattern of missed appointments, broken commitments, incomplete tasks, and serial failures, punctuated by a flurry of last-minute activity as the final hearing approached.

### D. Father's Case-Plan Progress

{¶ 17} Father's participation in this case was troubling too. He was absent from the case for nearly the first year after the children's removal. When he did engage, his participation remained sporadic and his circumstances precarious.

{¶ 18} Father completed a drug-and-alcohol assessment and was not recommended any follow-up care. He completed parenting classes. He began working part-time at a warehouse in November 2024. But his income remained a serious concern. For December 2024, his total earnings were $1,200. As of March 2025, his year-to-date income was less than $5,000. He also receives $1,000 per month in social security

payments.

{¶ 19} Father obtained housing with a monthly rent of $1,200. The agency expressed concern that his monthly income was entirely consumed by rent, leaving nothing for groceries, utilities, or the children's needs. Father's plan was to rely on family members to pay his rent until he found full-time employment. At the time of the hearing, he had not renewed his lease, which was set to expire in April 2025. He told the GAL that he was contemplating moving back to Fayette County, even though his job was over an hour away in Westerville, Ohio, and he had no plan for childcare.

{¶ 20} Father's visitation record reflected his limited engagement. He attended only 26 of 46 scheduled visits with the children. When he failed to appear, he often did not notify the visitation center. The agency amended the case plan in October 2024 to add the explicit requirement that Father bring food to all visits and not rely on Mother to provide for the children. Father refused to sign this amended plan. After the amendment, five visits occurred, and Father attended only three. Of those three, he provided food at only two. The caseworker testified that Father told her it was either money for gas or money for food to bring to the visit, but he could not do both.

{¶ 21} Father's legal difficulties compounded these concerns. He had an outstanding warrant for driving under suspension and multiple traffic violations. On one occasion, he called to cancel a visit because he had been pulled over while driving on a suspended license. Even after the hearing dates began, he continued to drive on his suspended license.

{¶ 22} Father owed approximately $10,000 in child-support arrears. The case supervisor testified that Father "has never provided for these kids by himself, it has always been [Mother]." Indeed, Father turned down the opportunity to take the children at

removal because his living situation would not allow it and he could not pass a drug screen.

{¶ 23} Father testified that he believed he earned between $3,400 and $4,500 per month, more than enough to care for three children. But on cross-examination, he acknowledged that his paystub showed an hourly wage lower than he had stated. He estimated his total monthly expenses, including rent and utilities, at approximately $1,600. He testified that he could ask his brother, who lived 20 to 25 minutes away, to help with childcare.

{¶ 24} The GAL testified that when she asked Father about where the children would receive counseling if placed with him, he stated that he had not looked into it and would have to "determine whether he felt they needed to continue with counseling."

### E. The Children's Placement and Progress

{¶ 25} All three children have resided in the same foster home since June 2023. The foster parents have cared for them continuously for nearly two years.

{¶ 26} The evidence at the hearing established that all three children are bonded with their foster parents. All three children participate in multiple activities, receive counseling, and get along well with each other and their foster parents.

{¶ 27} The juvenile court conducted an in-camera interview with V.T., the oldest child. V.T. referred to her foster parents as "Mommy and Daddy" and to her biological parents as "Momma Alecia" and "Daddy Nigel." While she did not explicitly state her wishes about her living situation, when she was asked who she would want to live with her if she had a "super big house," she immediately said first her foster parents. Last in the list were Mother and Father, "Cause if I was at, if I had a big house and uhm my foster parents were there they couldn't do anything to me, because my foster parents." V.T. told

the judge that she was afraid of Mother and Father "[n]ot feeding me, not being nice to me."

{¶ 28} The foster home is a foster-to-adopt placement, and the foster parents have expressed their desire to adopt all three children. The GAL submitted a written report recommending that permanent custody be granted to the agency. She testified that the children are safe and doing well in their current home and that granting permanent custody is in the children's best interest.

**F. The Trial Court's Decision**

{¶ 29} By judgment entry filed June 27, 2025, the juvenile court granted the agency's motion for permanent custody of the children, terminating the parental rights of both Mother and Father.

{¶ 30} Mother and Father appealed.

**II. Analysis**

{¶ 31} Mother and Father each challenge the juvenile court's decision. Mother argues the decision is against the manifest weight of the evidence when it did not restore custody to her or, alternatively, to Father. Mother also asserts the decision is not supported by sufficient evidence. Father similarly argues that the court's decision is against the manifest weight of the evidence. Because the parties' issues are interrelated, we address the assignments of error together.

**A. Standard of Review**

{¶ 32} R.C. 2151.414 authorizes a juvenile court to terminate parental rights and award permanent custody of a child to a children services agency. *In re B.O.*, 2024-Ohio-1732, ¶ 34 (12th Dist.). Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and

- 8 -

convincing evidence that the statutory standards for permanent custody have been met. *In re M.W.*, 2025-Ohio-1968, ¶ 11 (12th Dist.); *see also Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.'" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 33} "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re B.O.* at ¶ 37, citing *In re L.B.*, 2020-Ohio-3045, ¶ 29 (10th Dist.). When reviewing for manifest weight, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *In re M.G.*, 2023-Ohio-1316, ¶ 45 (12th Dist.). "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.). We are especially mindful of this presumption in permanent custody cases. *In re M.G.* at ¶ 45.

## B. The Two-Part Permanent Custody Test

{¶ 34} Before terminating parental rights and awarding permanent custody of a child to a children services agency, R.C. 2151.414 requires the court to make findings under a two-part test. *In re B.O.*, 2024-Ohio-1732, at ¶ 34. First, the juvenile court must

- 9 -

find, using the factors set forth in R.C. 2151.414(D)(1), that the grant of permanent custody to the agency is in the best interest of the child. *Id*. Second, under R.C. 2151.414(B)(1), the juvenile court must find that any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies. "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." *In re A.D.*, 2022-Ohio-736, ¶ 20 (12th Dist.), citing R.C. 2151.414(B)(1)(d).

{¶ 35} Here, Mother does not dispute and Father expressly concedes the trial court's finding that the children were in the temporary custody of the agency for at least 12 or more months of a consecutive 22-month period before the agency filed its motion for permanent custody. The record supports the court's finding. We therefore consider the second prong of the permanent-custody test established.

{¶ 36} The parties' challenge focuses instead on the first prong: whether the grant of permanent custody was in the children's best interest.

## C. Best-Interest Determination

{¶ 37} In determining a child's best interest, a juvenile court must consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the circumstances listed in R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(D)(1)(a)-(e); *In re M.W.*, 2025-Ohio-1968, at ¶ 11.

{¶ 38} No single factor is entitled to more weight than the others. *In re P.M.*, 2024-Ohio-4958, ¶ 36 (12th Dist.). Moreover, in making these determinations, a court is not to consider the effect the granting of permanent custody would have on any parent of the child. R.C. 2151.414(C).

### 1. Interaction and Interrelationship

{¶ 39} The trial court found that while the interrelationship between the children and Mother was "close," the children "have not had a close relationship with Father" and are "closest to their foster parents." Father challenges this finding, arguing it was based solely on his absence during the first year of the case and his attendance at only 26 out of 46 visits.

{¶ 40} That argument understates the record's damning portrait of Father's disengagement. Father was absent for approximately the first year after the children's removal. And even after becoming engaged, his participation remained sporadic and halfhearted. He attended barely more than half of the scheduled visits and, when he did not appear, often failed to notify the visitation center. When Father did attend visits, he did not consistently provide the basic necessities required by his case plan, including food for the children. The caseworker testified that Father informed her it was either money for gas or money for food, but he could not do both. That Father's financial circumstances placed him in a position where he could not simultaneously drive to visit his children and bring them something to eat tells us a great deal about his capacity to care for three young children.

{¶ 41} By contrast, the children have thrived in their foster placement. They have resided with the same foster family since June 2023, a period of nearly two years. All three children are bonded to their foster parents. The oldest child refers to her foster

parents as "Mommy and Daddy." The GAL testified that the children are safe and doing well.

{¶ 42} The trial court's finding was supported by the evidence. Even if the children had some bond with Mother or Father, this does not preclude an award of permanent custody when that bond pales in comparison to the stable, nurturing relationships the children have developed with their foster parents. *See In re B.O.*, 2024-Ohio-1732, at ¶ 56.

### 2. The Wishes of the Children

{¶ 43} The statute expressly authorizes the court to consider a child's wishes "with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). The court may consider the child's wishes either directly or through the GAL's report. *In re B.O.* at ¶ 57. Neither Mother nor Father contests the trial court's consideration of this factor.

{¶ 44} The trial court conducted an in-camera interview with V.T., the oldest child. The court found that despite V.T.'s young age, she was "wise beyond her years and competent for purposes of the in-camera interview." The court specifically considered her wishes and concerns in reaching its decision. The GAL stated in her report that each of the children expressed a preference to continue living with their foster parents.

{¶ 45} V.T.'s in-camera statements are particularly poignant. When asked who she would want to live with, she placed her foster parents first. She placed Mother and Father last. And when asked why, she said she was afraid of them "[n]ot feeding me, not being nice to me." A child should not fear her parents.

### 3. Custodial History

{¶ 46} The children's custodial history supported permanent custody under R.C. 2151.414(D)(1)(c), which Father expressly concedes. By the last date of the permanent-

custody hearing, the children had been in the agency's custody for two years. The trial court specifically found that "the agency kept extending and extending the timeframe for the parents to complete the requirements for reunification, but the parents moved at a snail's pace, which was at complete odds with the pace the children became bonded with their foster to adopt parents."

{¶ 47} This finding reflects an important reality. While parents work toward reunification, children continue to grow, develop attachments, and need stability. Time for a child differs markedly from time for an adult. Two years represents a substantial portion of young children's lives, and the children here spent that formative period bonding to their foster family.

### 4. Need for Legally Secure Permanent Placement

{¶ 48} This factor lies at the heart of both parents' appeals. Father argues the trial court "failed to consider his current housing arrangement and looked instead to the past inadequate arrangements." Mother similarly contends she had completed her case plan and was ready for reunification.

{¶ 49} These arguments require us to address what "case-plan completion" actually means. Both parents place considerable weight on their asserted compliance with case-plan requirements. Mother emphasizes that she obtained housing and employment, completed parenting classes, enrolled in drug treatment, maintained negative drug screens at the time of the final hearing, and was receiving treatment at Autumn Behavioral Health. Father notes that he completed parenting classes and assessments, obtained housing, and was employed.

{¶ 50} But this is not how case-plan completion works. We have repeatedly held that "the completion of case plan requirements does not preclude a grant of permanent

- 13 -

custody." *In re K.K.*, 2023-Ohio-400, ¶ 51 (12th Dist.). This principle is rooted in the purpose of case plans: "a case plan is merely a means to a goal and not a goal in itself." *In re B.O.*, 2024-Ohio-1732, at ¶ 50. The key concern is not whether the parent has checked boxes on a form, but whether the parent has substantially remedied the concerns that caused the child's removal. *In re K.K.* at ¶ 51. Viewed through this lens, the evidence reveals that neither parent came close to substantially remedying the core concerns.

{¶ 51} Start with Mother. Her participation in services came far too late. She handed the caseworker her parenting-class certificate on the morning of the last day of the hearing. She had been engaged in drug treatment at five different treatment centers, having been unsuccessfully discharged from one after another, and had only been consistent in treatment for 30 days by the final hearing. Mother failed to provide a copy of her mental-health assessment to the agency. Most significantly, she failed to comply with weekly random drug screens until after the first permanent-custody hearing date and tested positive for drugs as recently as October 2024.

{¶ 52} Mother's housing situation remained fundamentally uncertain. She did not provide proof of her residence until the final hearing date. She lived in a home with a man whose relationship to Mother remained unclear and who refused to submit to the background check the agency requested. Mother testified she "didn't know" whether she might move in with Father in the future. As the trial court aptly observed, Mother's "plans remained up in the air."

{¶ 53} Father's situation was no better. Although he obtained housing, his financial capacity to maintain that housing while supporting three children was illusory. His $1,200 monthly rent consumed his entire December income. Even with his $1,000 monthly social-security payment, Father's resources were grossly insufficient to provide for the

children's basic needs. His plan to rely on family members to pay his bills was not a plan at all. As the agency noted, it cannot return children to a parent hoping family will help him pay his rent.

{¶ 54} Father's instability extended beyond finances. He had not renewed his lease and was contemplating moving back to Fayette County without any plan for childcare or the children's counseling needs. The GAL expressed concern about Father's ability to parent on his own with adequate income. Father had not even investigated where the children would receive counseling if placed with him and held the opinion that the children did not need counseling. That opinion is troubling given the trauma of their removal and prolonged separation from their parents.

{¶ 55} Most tellingly, neither parent demonstrated the capacity to provide not merely housing but a legally secure permanent placement. The statute requires courts to consider "whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). The phrase "legally secure permanent placement" connotes more than a roof over the children's heads. It encompasses stability, both material and emotional; consistency in meeting the children's needs; and the reasonable assurance that such stability will endure. Here, the evidence painted a picture of continuing instability. As the trial court found, "[t]he parents have not showed sufficient stability to ensure they can provide a legally secure placement."

{¶ 56} Father's argument that the trial court "failed to consider his current housing arrangement" is unavailing. The trial court explicitly acknowledged Father's lease arrangement but properly considered it in context. A lease does not ensure stability when the lessee lacks resources to pay rent and utilities, provide food, cover childcare costs, arrange transportation, and meet children's medical and therapy needs. The trial court

did not improperly dwell on past inadequacies. Rather, it realistically assessed Father's present circumstances in their totality. And those present circumstances were disqualifying.

{¶ 57} Against this backdrop of parental instability, the children's foster placement offered genuine security. The foster parents are willing to adopt all three children. The children have bonded with them over two years and think of them as "Mommy and Daddy." The children are thriving academically, participating in activities, receiving counseling, and progressing developmentally. This is what legally secure permanent placement looks like.

### 5. Factors in R.C. 2151.414(E)(7)-(11)

{¶ 58} The trial court found none of these factors relevant to this case. Neither parent challenges this determination, and the record supports it. These provisions address specific circumstances such as prior criminal convictions, withholding food or medical treatment, endangerment through substance abuse, abandonment, and prior terminations of parental rights. None apply here.

### D. Time's Up

{¶ 59} "'A child's life . . . is not something the juvenile court should take a gamble on. This holds true no matter how good the odds may seem.'" *In re M.W.*, 2025-Ohio-1968, at ¶ 16, quoting *In re M.G.*, 2023-Ohio-1316, at ¶ 58. Children are not experiments in parental rehabilitation. The law does not require the court to test whether children will suffer great detriment or harm before protecting them. *In re B.O.*, 2024-Ohio-1732, at ¶ 52.

{¶ 60} Mother and Father were given every opportunity to demonstrate their capacity for reunification. The agency extended deadlines repeatedly. All parties

stipulated to a continuance specifically to give Mother and Father more time to work on their case plans. Yet when the final hearing concluded in March 2025, nearly two years after removal, neither parent had demonstrated readiness for reunification.

{¶ 61} The record before us is not a close call. Mother's life has been marked by drug abuse, treatment failures, housing instability, and an inability to follow through on even basic requirements. Father was absent for the first year, then engaged sporadically, and throughout has lacked the financial means or practical capacity to provide for three children. Neither parent's brief meaningfully grapples with this record. Instead, both briefs offer rosily optimistic characterizations that the evidence simply does not support.

{¶ 62} The juvenile court did not clearly lose its way. To the contrary, on this record, there was only one reasonable outcome. The children's need for a permanent, stable home could not wait any longer for parents who had shown, again and again, that they could not provide one.

### III. Conclusion

{¶ 63} Mother's assignment of error and Father's assignment of error are overruled. The judgment of the juvenile court is affirmed.

HENDRICKSON, P.J., and BYRNE, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Fayette County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Matthew R. Byrne, Judge

/s/ Mike Powell, Judge