[Cite as *In re H.B.*, 2025-Ohio-5090.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

IN RE: H.B.

C.A. No.        25AP0018


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.        2023 JUV-C 000547

DECISION AND JOURNAL ENTRY

Dated: November 10, 2025

FLAGG LANZINGER, Presiding Judge.

{¶1}    Appellant Mother appeals the judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her child in the permanent custody of Wayne County Children Services Board ("CSB" or "the agency").  This Court affirms.

I.

{¶2}    Mother is the biological mother of H.B., born February 28, 2019.  Mother has five other children, including an infant born during the case below.  Father established his paternity of H.B. and participated in some proceedings below, but he has not appealed.

{¶3}    Records from a well-child visit when H.B. was four years old indicated that the child had significant language and other developmental delays, as well as extremely high levels of lead in his system.  CSB began working with Mother on a voluntary basis to help her address concerns regarding H.B. and issues of medical negligence regarding a sibling.  Medical personnel directed Mother to follow up regarding the children's exposure to lead in the home and ongoing

testing for H.B. CSB reached out to Mother no fewer than ten times to remind her to take H.B. for follow-up medical screening and care over a three-month period. On some occasions, Mother was not at home when the caseworker visited. On others, Mother refused access to her home but promised to follow up with H.B.'s medical care. After Mother failed for three months to address concerns regarding the child, CSB filed a complaint alleging that H.B. was a neglected and dependent child. The agency did not remove the child from his home but requested protective supervision.

{¶4} Six weeks later, CSB sought an emergency order of temporary custody of H.B. after police removed the child and his four siblings from Mother's home pursuant to Juv.R. 6. Then four-year-old H.B. was found wandering alone on a busy road. There were no adults present when the police returned the child home. The 14-year-old eldest sibling had been left to care for the four younger children, two of whom had special needs. Mother and her husband were visiting their newborn in the hospital.

{¶5} When Mother returned home, she allowed an agency caseworker inside. The caseworker found H.B. covered in bruises, bug bites, and dried feces. The home conditions were inappropriate. There were dirty diapers on the floors, human feces on various walls, two broken bunk beds, a broken second floor window, and broken windows in the front door. An eleven-year-old sibling reported that Mother would lock H.B. and another sibling in a bedroom for extended periods of time. Mother had no viable safety plan for the children in her absence. The juvenile court placed the five siblings in CSB's emergency temporary custody. At the shelter care hearing, Mother stipulated to probable cause for the children's removals and their placement in the agency's emergency temporary custody.

{¶6} Mother waived her right to an adjudicatory hearing and stipulated that H.B. was a dependent child. CSB dismissed its allegation of neglect. Mother later waived her right to a dispositional hearing and agreed to the child's placement in CSB's temporary custody and the adoption of the agency's case plan as a court order. The case plan required Mother to engage in parenting education and follow all recommendations; obtain a psychological assessment and follow all recommendations; schedule medical appointments to have H.B.'s siblings tested for lead exposure; and demonstrate the ability to meet the children's basic needs by applying for employment and housing services, seeking employment assistance from Wayne County Department of Job and Family Services, and executing all necessary releases of information to the agency.

{¶7} Ten months into the case, CSB moved for a first six-month extension of temporary custody because Mother had made some progress on her case plan objectives. She completed a psychological assessment, but her therapist determined that Mother's presentation rendered those results invalid. Therefore, a reassessment was required. Mother was engaged in counseling and successfully completed a parenting class. She was in the process of vacating her lead-contaminated home and moving elsewhere. At the motion hearing, the parties stipulated to a first six-month extension of temporary custody.

{¶8} Prior to the sunset date, CSB moved for permanent custody. The agency alleged that H.B. had been in its temporary custody in excess of twelve months during the past 22-month period and that permanent custody was in the child's best interest given the parents' insufficient case plan progress and the lack of any viable legal custodians. Mother moved for legal custody of H.B. and his four older siblings.

{¶9} After a two-day hearing on the parties' competing dispositional motions, the juvenile court granted CSB's motion for permanent custody and terminated all parental rights. Mother timely appealed, raising two assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WITHOUT PROPERLY CONSIDERING THE PARENTS['] SUBSTANTIAL COMPLIANCE WITH THE CASE PLAN AND THE CHILD[']S BEST INTERESTS.

{¶10} Mother argues that the juvenile court's judgment awarding permanent custody of H.B. to CSB is against the manifest weight of the evidence. This Court disagrees.

{¶11} In determining whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley* at ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under R.C. 2151.414(D)(1).  R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶13}  The best interest factors include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply.  R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.).  Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.)  *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶14}  As to the first prong, CSB alleged that H.B. had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d).  Mother does not contest this finding.  Our review of the record indicates that clear and convincing evidence supports the trial court's first prong finding.

{¶15}  Mother argues that permanent custody is not in the child's best interest.  Moreover, she argues that the juvenile court failed to adequately consider her compliance with her case plan objectives.

{¶16}  As an initial matter, our review of the judgment entry indicates that the juvenile court considered in detail Mother's case plan compliance.  The trial court made multiple findings regarding Mother's participation in parenting education and psychological services, as well as her ability to meet the child's basic needs.  Bearing in mind our long-held position that a parent's case plan compliance is relevant but not dispositive of the issue of a child's best interest, this Court will

address Mother's compliance later in our analysis. *See In re M.S.*, 2023-Ohio-1558, ¶ 24 (9th Dist.).

{¶17} H.B. was in Mother's legal custody until CSB removed him when he was four years old. By the time of the permanent custody hearing, the child had spent 20 months in the agency's temporary custody, placed in the same therapeutic foster home the entire time.

{¶18} The agency visitation specialist who supervised most of Mother's visits testified that she did not observe a deep parent-child bond between Mother and H.B. On the other hand, both the agency caseworker and the foster mother testified that H.B. has a strong bond with the foster family. The foster mother works from home, while the foster father has taken a leave of absence from work to focus on ensuring H.B. attends visitation with Mother and his many medical and other service appointments. Both foster parents and their two teenage daughters work with H.B. on his communication skills and interact with him during his favorite activities, including interactive reading, building things, and dancing.

{¶19} H.B. is in his second year of integrated preschool, where he is one of seven special needs children in a classroom with six peers who are developmentally on target. The child is social and enjoys engaging with both the children and adults in his classroom.

{¶20} H.B. was just shy of his sixth birthday at the time of the hearing. Due to his lack of maturity and limited communication skills, the guardian ad litem made a recommendation for custody on his behalf. After noting limited compliance by Mother with her case plan objectives and Mother's failure to maintain contact with her during the prior three months, the guardian ad litem opined that awarding permanent custody of the child to CSB was in H.B.'s best interest. She recommended terminating the parents' parental rights so that the child could find stability in an environment where his basic and special needs would be met consistently.

{¶21} After 20 months in the agency's temporary custody, H.B. needed a legally secure permanent placement. Mother had not demonstrated the ability to provide such an environment for the child. Although Mother completed the parenting education component of the case plan, the guardian ad litem reported that the parenting assessor was "unable to gain any insight or understanding into parenting style, strengths or challenges as the information parents shared did not indicate any struggles and appeared to be near perfect." This comported with Mother's therapist's testimony that Mother attempted to portray herself in a positive light and failed to acknowledge or take accountability for the circumstances that led to the child's removal from home.

{¶22} In addition, the visitation specialist testified that after completing parenting classes, Mother failed to assimilate the information to apply it during visits. Instead, Mother could only follow directions at the time given, requiring the specialist to repeatedly redirect Mother visit after visit. For example, the child is clumsy, frequently falling, running into objects, and injuring himself. After each incident, the visitation specialist had to direct Mother to check on the child and comfort him because she consistently failed to do so. In addition, Mother could not efficiently manage H.B. in the bathroom without intervention by the specialist. While the visitation specialist did not believe that Mother would intentionally harm the child, she remained concerned that Mother would not properly oversee H.B.'s care and hygiene.

{¶23} As to Mother's mental health objective, the caseworker was concerned about Mother's delay in seriously engaging in services. Mother was not honest in her self-portrayal during her first psychological assessment. After her second assessment, which her therapist deemed valid, Mother failed to engage in the recommended counseling for approximately five months. Her therapist testified that Mother had only recently begun taking accountability for her

actions and inactions that led to the child's removal from home. Mother continued to struggle with anxiety, feelings of inadequacy, and a sense of being overwhelmed by the needs of her children.

{¶24} Mother's therapist stressed the importance of her engagement in individual counseling on a regular basis, which he described as once a week. He added that he recommended that Mother work on taking accountability for her role in the children's removals from home; seek medication management; address her housing situation, including lead abatement measures; and develop a support system, given that she has more than one special needs child. While Mother had resumed weekly counseling, she had only done so two months prior to the hearing. Moreover, she had only recently exhibited some insight into her actions and inactions necessitating CSB's involvement with the family. There was no evidence that Mother had sought medical services for medications to help manage her mental health issues. In addition, while Mother testified that her situation had changed from one of being overwhelmed with no support system, she did not identify any relationships she had established that would help support her when she struggled to parent effectively. There was no evidence that Mother had joined any peer groups, such as organizations for parents with special needs children, as recommended by her counselor.

{¶25} The remainder of the therapist's recommendations implicated Mother's ability to meet the basic needs of her children. The CSB caseworker testified that the agency removed the children from a home contaminated with lead, with locks on the outside of certain doors leading to rooms filled with trash and feces on the walls. Those were the rooms where H.B. and his sister E.B. had been confined for long periods of time.

{¶26} Ten months into the case, Mother moved into another older home that she did not have tested for lead. During a visit to the new home, the caseworker found it to be appropriate. Mother had the necessary furnishings, working utilities, adequate food, and enough bedrooms for

the family. There were no apparent hazards. Three months prior to the permanent custody hearing, Mother refused further access by the caseworker and guardian ad litem to her home. Accordingly, neither could testify as to the current conditions of Mother's home.

{¶27} Mother remained vague throughout the case regarding her financial circumstances. Initially, she reported that she sold crafts to support herself, but she did not provide any verifying documentation. Later, she reported that she worked for DoorDash and planned to start working at Barnes and Noble. The caseworker was unable to verify Mother's claims due to Mother's refusal to meet with the caseworker in the three months prior to the hearing. Mother's husband was earning $600 bi-weekly as an RTA bus driver.

{¶28} The caseworker expressed serious concerns regarding Mother's ability to provide financially for the family's basic needs. Mother previously paid monthly rent in the amount of $600. She fell behind in her rent payments, and her previous landlord secured a judgment against her for back rent in the amount of $6,000. Mother's current rent in her new home is $1,150 per month. The caseworker testified that she was concerned whether Mother would be able to pay that "sizeable increase[,]" given her inability to pay the lesser amount of rent in her prior home.

{¶29} While Mother argues that she has successfully completed her case plan objectives, the clear and convincing evidence demonstrates otherwise. Although she completed her parenting classes, Mother struggled to apply the lessons during her visits with H.B. While she engaged in counseling, there were gaps in her participation. She only recently began to glean any insight into her role in the children's removals from home. Her therapist testified that she would need several more months of counseling to meet her therapeutic goals. Finally, despite efforts by the caseworker and guardian ad litem to verify that Mother's home was safe and appropriate and that she could financially meet H.B.'s basic and special needs, Mother refused to cooperate during the

three months leading up to the hearing. Historical concerns regarding supervision and basic care for the children required verification of Mother's current ability to provide a stable and healthy environment for H.B.

{¶30} H.B. was almost six years old at the time of the hearing. He is significantly developmentally delayed. He was nonverbal at the time of his removal at the age of four years. He is learning to communicate verbally, but his speech remains limited and inarticulate. He uses an application on an iPad to clarify words he cannot say clearly. His foster family, daycare providers, and early childhood intervention specialist at preschool work diligently with H.B. to help him improve his communication skills. He is on an IEP at school to address four specific goals.

{¶31} H.B. participates in speech therapy, physical therapy due to his unsteadiness on his feet, and occupational therapy to improve his gross and fine motor skills. He has a pre-academic goal which focuses on skills necessary for kindergarten. Those include learning letters and numbers, and how to count. Because of these services and their reinforcement by the foster parents, H.B. is on track to enter kindergarten next year, albeit in an integrated setting with ongoing support by an intervention specialist.

{¶32} As a four-year-old when he came into care, the child was not yet potty trained. Through the cooperative efforts of the foster parents and daycare care providers, H.B. learned to use the toilet over the summer when he was five years old. He still requires some assistance to ensure he has cleaned himself fully.

{¶33} The foster mother testified that H.B. has an autism assessment scheduled shortly after the last day of hearing. She added that he does not transition easily from one activity to the next, is still physically clumsy and unbalanced, and requires monitoring at all times to ensure his

safety. She anticipated that the child would begin trauma therapy once his communication skills improve. The foster mother testified that stability and routine are key for H.B.'s development and well-being.

{¶34} The foster family had provided the necessary care and stability for H.B. for 20 months by the time of the hearing. While still delayed, the child has made great improvements in their home in conjunction with intervention services. Mother took no action to address H.B.'s delays while in her custody and repeatedly failed to follow up with the child's medical care to address his exposure to high levels of lead. There is a current plan in place to address the child's special needs, while Mother presented no evidence regarding her plan to maintain him in services or continue to address the child's care. Mother failed to work with H.B. during visits to reinforce his progress. She did not monitor him to prevent injuries from falls or other accidents arising out of the child's lack of balance. When H.B. sustained injuries during play, Mother did not check on him or comfort him unless the visitation specialist specifically directed her to do so.

{¶35} No viable relatives or kin were willing and able to accept legal custody of H.B. The agency Connect to Family caseworker testified that she created a family tree for the child and reached out to 80 relatives regarding placement. Two family members responded to her inquiry, but both reported that they could not provide a home for H.B. Neither parent provided additional names for the agency's consideration for placement.

{¶36} No R.C. 2151.414(E)(7)-(11) factors are applicable as to Mother. However, Father abandoned the child under subsection (E)(10).

{¶37} Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody of H.B. to CSB. The child entered

the agency's care with significant delays and signs of neglect. After 20 months of dedication by CSB, the foster parents, and other service providers in addressing his special needs, H.B. has shown ongoing improvement. Mother has made little effort to reinforce the child's progress or develop a parent-child bond. She failed to intervene to prevent falls or comfort him after injuries without direction by the visitation specialist. Mother obtained housing and claimed to be employed but refused to grant access or provide any verification to the caseworker and guardian ad litem in the three months preceding the hearing. No relatives or kin are able and willing to seek custody.

{¶38} The child is comfortable in a foster home that has consistently met and is willing to continue to meet his basic and special needs. The services facilitated by the foster parents have ameliorated some of the child's delays and he is on track for further progress, although he will require ongoing interventions. Mother has not demonstrated an understanding of how to interact with the child to maintain and stimulate his progress and has not articulated a plan to address H.B.'s special needs in her home. In consideration of the circumstances here, CSB presented clear and convincing evidence that the award of permanent custody is in the best interest of the child. Accordingly, the juvenile court's judgment terminating Mother's parental rights is not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT FAILED TO CONSIDER LESS RESTRICTIVE ALTERNATIVES TO PERMANENT CUSTODY.

{¶39} Mother argues that the juvenile court erred by failing to extend CSB's temporary custody of the child for an additional six months. This Court disagrees.

{¶40} There was no motion for a second extension of temporary custody pending before the juvenile court for consideration. CSB had filed a motion for permanent custody and Mother had filed a motion to return the child to her custody. The parties waived opening statements, and

there was no oral motion to extend temporary custody raised prior to the presentation of the parties' cases in chief. In her closing argument, Mother asked the juvenile court for the first time to consider giving her more time if it was not prepared to return H.B. to her custody. However, she did not expressly ask for a second six-month extension of temporary custody, mention R.C. 2151.415(D)(2), or argue that she had proved the four statutory requirements by clear and convincing evidence. Under these circumstances, the juvenile court did not err by failing to extend CSB's temporary custody of H.B. for an additional six months. Mother's second assignment of error is overruled.

## III.

{¶41} Mother's two assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JILL FLAGG LANZINGER
FOR THE COURT

SUTTON, J.
STEVENSON, J.
CONCUR.

APPEARANCES:

YU MI KIM-REYNOLDS, Attorney at Law, for Appellant.

ANGELA POTH-WYPASEK, Prosecuting Attorney, and DAVID J. FOLK, Assistant Prosecuting Attorney, for Appellee.