[Cite as *In re C.M.*, 2026-Ohio-696.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE:                  :

    C.M.              :

                       :

                       :

                       :

CASE NO. CA2025-09-086

OPINION AND
JUDGMENT ENTRY
3/2/2026

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 23-D000088

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Holly M. Simpson, for appellant, mother.

Lauren L. Clouse, for appellant, father.

Andrew Brenner, for CASA.

**O P I N I O N**

**M. POWELL, J.**

{¶ 1} Appellants, Mother and Father, separately appeal a decision of the Warren

County Court of Common Pleas, Juvenile Division, granting permanent custody of their four-year old son ("Charlie") to Warren County Children Services ("the Agency").[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Father and Mother were married to one another when Charlie was born in June 2021. They separated in December 2022 and were divorced in July 2023. Charlie's growth and development was difficult from the start as he had problems with weight gain. When he was 45 days old, he was hospitalized for two weeks for failure to thrive. He was diagnosed with development delay, and his then pediatrician recommended Help Me Grow. The parents participated with Help Me Grow for only a short period of time because they did not believe it benefitted Charlie.

{¶ 3} Following the parties' divorce, Father had limited contact with Mother and was rarely able to see Charlie. In mid-September 2023, Charlie spent a weekend with Father during which Father observed bruises on Charlie's body. Father was suspicious enough about the bruises that he photographed them to protect himself from accusation. However, Father did not report the injuries or take Charlie to the hospital because he believed Mother's explanation that the bruises were caused when Charlie fell during physical therapy at Children's Hospital and that the hospital had documented the fall and the injuries. Mother's explanation was a lie. The record shows that Charlie started attending a daycare in late August 2023 and started showing up with bruises. Mother's explanation was that Charlie had fallen or was clumsy. In early September 2023, a daycare employee photographed bruising on Charlie's face, back, and right arm. The daycare did not report the injuries, and Charlie's Maternal Grandmother asked that it not report Mother. The photographs taken by the daycare employee were admitted into

---

1. "Charlie" is a pseudonym adopted in the opinion for purposes of privacy and readability. *In re A.M.*, 2023-Ohio-1523 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d. Ed. 2024).

evidence during the permanent custody hearing. Father's photographs were not submitted into evidence and were no longer on his cellphone.

{¶ 4} The Agency became involved with the family when Mother brought Charlie to Dayton Children's Hospital on September 29, 2023, with several bruises, swelling, and a limp arm. Medical examination revealed that Charlie had two fractures on his right clavicle and a fracture on his right upper arm. He also had bruising on his right ear, the right side of his forehead, his left eyelid, the right side of his neck, his chest, and the back of a hand. Mother reported that she had dropped off Charlie at his daycare that morning with one bruise and a slight temperature, but no other bruises. The daycare provider reported that Charlie had not been at the daycare on September 29, 2023. Law enforcement executed an officer removal on September 30, 2023. Prior to his removal, Charlie resided primarily with Mother and her live-in boyfriend. Charlie also regularly stayed with Maternal Grandparents.

{¶ 5} On October 2, 2023, the Agency filed a complaint alleging that Charlie was abused and dependent. The juvenile court placed Charlie in the temporary custody of the Agency and appointed a Court Appointed Special Advocate ("CASA") for Charlie.

{¶ 6} Charlie remained in the hospital for a week. Upon his discharge on October 6, 2023, he was placed with Foster Mother where he remained for the duration of the case. Charlie, who was then a little over two years old, was not walking, was nonverbal, had a severe food aversion, and was receiving nasogastric (NG) feeds four times a day. The NG-tube was replaced by a gastrostomy tube ("G-tube") in June 2024. Although Charlie's oral intake of pureed food has improved overtime, it is not enough to sustain his nutritional needs and he continues to receive G-tube feeds four times a day. Charlie will stop using the G-tube only after he is able to eat full meals by mouth for at least a year.

{¶ 7} Based on her professional experience with developmental delays and

- 3 -

special needs, Foster Mother strongly believed Charlie had autism and had him evaluated. Multiple services were also set up, including occupational therapy, physical therapy, speech therapy, and feeding therapy. Charlie was officially diagnosed with autism and global development delay in early 2024. Under Foster Mother's care, Charlie has made significant progress. He is now able to walk and has been learning to communicate his needs by using a speech device and learning some sign language since March 2025.

{¶ 8} During the police investigation regarding Charlie's fractured clavicle and right arm, Mother told law enforcement and the hospital social worker various stories about how Charlie sustained the injuries. Mother was eventually indicted on three felony offenses in January 2024, pled guilty to child endangering for abusing Charlie in October 2024, and was sentenced to a prison term of two to three years in February 2025.

{¶ 9} Throughout the case and notwithstanding Mother's guilty plea, Father never believed she inflicted the injuries and instead believed Mother's explanation that her live-in boyfriend was the culprit. Shortly after the Agency filed its complaint, Father "got involved" with Mother, resumed living with her around the time she was indicted in January 2024, and helped her pay her $10,000 bond and attorney fees while her criminal case was pending. Father denied his relationship with Mother during the proceedings was romantic and viewed his role as Mother's support person and protector. Father ended the relationship in January 2025, a month before Mother's sentencing, when Mother started acting erratically and became verbally hostile and oppositional to him.

{¶ 10} Throughout most of the case, Father was granted unsupervised visitation for eight hours a week. Because there was a protective order in place prohibiting Mother from seeing Charlie, Father's decision to live with Mother prevented him from bringing Charlie to their apartment for visitation. As a result, visitation had to take place in a public

space or in Lancaster, Ohio where Charlie's paternal grandparents and half-brother live. On the days Father did not take Charlie to Lancaster, Father would rarely use his full eight hours of visitation and would frequently return Charlie to Foster Mother's home early, claiming Charlie was tired or did not want to play anymore. Despite the caseworker's assurance he could do so, Father did not believe he could break up his eight hours of visitation into separate visits without a court order. Once Mother was incarcerated and Father was granted overnight visitation in March 2025, Father used the full eight hours of visitation.

{¶ 11} Charlie was adjudicated abused and dependent on December 19, 2023. The Agency implemented a family case plan in November 2023. As relevant here, the case plan required Father to complete a mental health assessment and a drug/alcohol assessment and follow all recommendations, maintain stable employment and housing, and attend and complete parenting classes. On September 18, 2024, the juvenile court granted a six-month extension of the Agency's temporary custody of Charlie. The Agency requested the extension to allow for a resolution of Mother's criminal case and to allow Father time to complete his case plan.

{¶ 12} On February 26, 2025, Father moved for legal custody of Charlie. Two days later, on February 28, 2025, the Agency moved for permanent custody of Charlie. A hearing on the motions was held on June 27, 2025, July 11, 2025, and September 8, 2025. The juvenile court heard testimony and took evidence from the Agency's ongoing caseworker, Mother, Father, Foster Mother, Charlie's daycare provider in September 2023, the CASA, and Charlie's speech pathologist. The CASA testified during the first day of the hearing, and the State elected to have her testify on the last day of the hearing in lieu of filing an updated CASA report. Testimony revealed that Father underwent a mental health evaluation and a drug/alcohol assessment and that neither recommended any

further action, that Father was fully employed as a security guard and earning $40,000-50,000 a year, that he has always maintained suitable housing, that he does not have substance abuse issues, and that there is a mutual loving bond between Father and Charlie. Father's work schedule consists of 12-hour shifts Saturday through Monday, and a six-hour shift on Tuesdays. Testimony also revealed the following.

{¶ 13} Over the course of the case, Charlie was hospitalized twice for testicular surgery–the second surgery required an overnight stay–and was otherwise taken to Children's Hospital on two separate occasions, once after he hit his head when he fell at daycare, and once because he had trouble breathing. Although Father was aware of the surgeries, he did not attend them and did not visit Charlie at the hospital, including during the overnight stay. Father explained he did not go because he believed doing so would count as visitation. He, however, asked Foster Mother to keep him updated. Likewise, Father did not go to the hospital on the other two occasions. Regarding the time Charlie went to the ER because of breathing issues, Father testified that Charlie started coughing during visitation. Father contacted the caseworker who stated it was likely allergies. As Charlie became lethargic, Father communicated several times with Foster Mother. At her suggestion, Father dropped off Charlie at her mother's house. When Foster Mother arrived at the house, Charlie was "totally lethargic," was coughing, and had trouble breathing. Foster Mother took him to the ER where he was eventually diagnosed with Croup. Father testified he did not take Charlie to the hospital because he did not have Charlie's medical card and he believed it would count as visitation.

{¶ 14} Although he was aware of them, Father also did not attend Charlie's autism evaluation in early 2024 or an Individual Education Plan ("IEP") meeting for Charlie in August 2024, never inquired about the results of either meeting, and never requested a copy of the reports. Father testified he knew early on that Charlie was autistic because

his older son is also autistic (Father's older son is a higher-functioning autistic child). Moreover, his attorney had provided him with the "highlights" of the autism report. Father did not explain why he did not go to the IEP meeting.

{¶ 15} Charlie started all his weekly therapies in October 2023. They take place over several days as Charlie has a very short attention span, can only tolerate one therapy per day, and would not benefit from the therapies if they all took place on the same day, as suggested by Father. Although Father was aware of the therapies, it was not until March 2025, when he was required to take Charlie to all his therapies, that he became involved with and started attending Charlie's therapies. Before March 2025, Foster Mother was the only one taking Charlie to his therapies. Father attended one feeding therapy session in June 2024, and per the caseworker, consistently attended only one of the other three therapies.

{¶ 16} Testimony shows that Father was originally very dismissive and critical of Charlie's therapies and against Charlie using a G-tube for feeding and a speech device. Father believed that Charlie was spending more time playing during therapies than learning. Once Father started attending the therapies, he became involved, is supportive and encouraging during therapies, and now admits he sees a lot of benefits in them. Father testified that Charlie has come a long way since Father started attending Charlie's therapies in March 2025. Incidentally, that time period is also when Charlie started using the speech device, thereby greatly improving his communication with others. As reported by the CASA, Father acknowledged telling her in May 2025 that the therapies were "fucking useless." However, Father denied the statement applied to all the therapies. Rather, he was likely referring to a feeding therapy session during which the therapist did not try to make Charlie use a spoon. Father testified that if he is given legal custody of Charlie, he will "absolutely" take him to all his therapies.

{¶ 17} Throughout the proceedings and during the permanent custody hearing, Father claimed that Charlie eats food by mouth when he is with him, that Charlie has started to talk and can tell his name and date of birth, that Charlie can play hide-and-seek, that Charlie is capable of jumping off from a small stand, and that Charlie has never had a tantrum during visitation. Foster Mother, who has a much closer day-to-day relationship with Charlie than Father, has never observed similar actions at home and they were never replicated during therapies. Father testified that although Charlie eats food by mouth during visitation, he also uses the G-tube to feed Charlie because he is required to do so.

{¶ 18} At the time of the permanent custody hearing, Father did not have a childcare plan in place for when he would work on the weekends. He, however, intended to rely on Maternal Grandparents despite the Agency's and the CASA's concerns regarding them. The concerns were based upon a substantiated allegation of emotional abuse of a foster teenager by Maternal Grandmother, the fact that Maternal Grandparents initially blamed Father and the daycare for Charlie's injuries, and their failure to report Charlie's injuries even though they knew the reporting procedure as former foster parents. Father testified that while the substantiated allegation of emotional abuse against Maternal Grandmother carried some weight, it was not enough for him to disallow any contact between Charlie and Maternal Grandmother. Likewise, the fact that Mother was in contact with Maternal Grandparents did not worry Father because Mother was their daughter. Finally, Father stood by a prior statement that if he gets legal custody of Charlie, how he will set up childcare, including using Maternal Grandparents, will no longer be the Agency's concern.

{¶ 19} Father testified he had found two daycares that specialized in autism. However, he had not had time to look into them. The CASA testified that she contacted

both daycares and discovered that Charlie was ineligible to attend one of them and that there was a very long waiting list (the other daycare never returned her call). The CASA also testified that Father did not understand how difficult it will be to find a daycare that can care for Charlie's special needs and G-tube feeding and accommodate Father's weekend work schedule.

{¶ 20} Throughout the case and during the permanent custody hearing, Father never wavered from his belief that Mother's live-in boyfriend, and not Mother herself, inflicted the injuries that prompted the Agency's removal of Charlie. Notwithstanding Mother's guilty plea to child endangering, Father repeatedly testified that Charlie's abuser was still free, that Mother did not cause the injuries, and that Mother was only responsible for not keeping Charlie safe and for failing to report the injuries. Father also testified that Mother lies a lot, that he still loves her, and that she is the mother of his son. Before resuming living with Mother in January 2024, Father told the CASA that Mother is a frequent liar who can expertly weave a convincing story. By contrast, after resuming living with Mother, Father talked positively about her until she was sentenced in February 2025. Positive statements included "she makes me a better person," "she lights up a room when she's in there," and describing Mother as "a gentle, wonderful person." Father testified he did not break up with Mother because of her guilty plea. Rather, he only broke up with her when she started behaving erratically shortly before her sentencing.

{¶ 21} Foster Mother described Charlie as a very social, outgoing, and happy child whose special needs require a lot of sustained work, including at home. Foster Mother testified that Charlie has made significant progress since he has been placed with her, thanks to the coordinated efforts and work of his amazing team consisting of Charlie's teachers, doctors, therapists, and herself. Foster Mother testified that Father does not fully understand what it takes to care for Charlie as he only has him for a few hours at a

time. Furthermore, Father has never expressed a willingness to learn from her or the therapists, and never asked to be part of Charlie's treatment team. Foster Mother expressed her desire to adopt Charlie should permanent custody be granted to the Agency.

{¶ 22} The caseworker testified that the Agency had the following concerns regarding Father throughout the case: (1) his failure to report the injuries he observed during his September 2023 visitation, (2) his living with Mother during the majority of the case, (3) his belief Mother was not the one who abused Charlie, (4) his ending his relationship with Mother only before she was sentenced, and (5) his failure to fully use his visitation, attend Charlie's therapies, and visit him in the hospital before the motion for permanent custody was filed in February 2025. The caseworker also testified that in light of Father's intention to rely on Maternal Grandparents, their continued contact with Mother, and the concern Mother could have contact with Charlie once released from prison, it was in Charlie's best interest to grant permanent custody to the Agency. When asked whether a court order prohibiting Mother and Maternal Grandparents from having any contact with Charlie would alleviate the Agency's concerns, the caseworker replied it was not clear whether Father would comply with the court order. Father testified he would comply with a no-contact court order regarding Maternal Grandparents even though he disagreed with it.

{¶ 23} The CASA filed several reports throughout the case. Her final report, filed three weeks before the first day of the permanent custody hearing, recommended that Charlie remain in the temporary custody of the Agency and that he be placed in Father's fulltime care following a slow transition. However, in the event the juvenile court was "not inclined to give Father more time," the CASA recommended granting permanent custody of Charlie to the Agency. By contrast, the CASA testified during the hearing that it was in

Charlie's best interest to award permanent custody to the Agency. The CASA explained that although Father's heart was in the right place and there was a clear loving bond between Father and Charlie, Father was not prepared and did not have the capabilities to care for all of Charlie's special needs on a fulltime basis. The CASA testified that Father's actions do not correlate with his statements, and she described Father's progress as "one step forward and then two steps backwards."

{¶ 24} Specifically, the CASA expressed concerns that Father does not seem to understand child development in general, let alone autistic child development, that Father does not fully understand Charlie's special needs, his developmental age, and his level of autism, and what it will take to care fulltime for Charlie, that Father has unrealistic expectations of Charlie's current and future capabilities, and that Father will not follow through with continued necessary therapies based on his belief he can make Charlie do more at home than the therapists can. The CASA also noted that Father's alignment with Mother for most of the case negatively interfered with his visitation and indicated Father was prioritizing his relationship with Mother over Charlie's needs.

{¶ 25} On September 9, 2025, the juvenile court issued a judgment entry granting the Agency permanent custody of Charlie. The juvenile court found that Charlie had been in the temporary custody of the Agency for 12 of a consecutive 22-month period, and that even if Charlie had not been in the Agency's temporary custody for 12 months of the last 22 months, he could not be placed with either parent within a reasonable period of time or should not be placed with them. The court further found that granting permanent custody to the Agency was in Charlie's best interest.

{¶ 26} Mother now appeals the juvenile court's decision, raising three assignments of error. Father also appeals the juvenile court's decision, raising two assignments of error. This court consolidated the appeals for review and disposition. For ease of

discussion, Mother's first and second assignments of error and Father's two assignments of error will be considered together.[2]

## II. ANALYSIS

{¶ 27} Mother's Assignment of Error No. 1:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE [DECISION].

{¶ 28} Mother's Assignment of Error No. 2:

THE TRIAL COURT ERRED IN AWARDING CUSTODY OF [CHARLIE] TO THE AGENCY WHEN THE DECISION VIOLATED THE CONSTITUTIONAL RIGHTS OF BOTH PARENTS.

{¶ 29} Father's Assignment of Error No. 1:

THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE CHILD CANNOT OR SHOULD NOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME PERIOD PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(E).

{¶ 30} Father's Assignment of Error No. 2:

THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILD, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES AND THAT THE AGENCY MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH FATHER.

{¶ 31} Father and Mother each challenge the juvenile court's decision granting permanent custody of Charlie to the Agency. Mother argues the decision is not supported by sufficient evidence and is against the manifest weight of the evidence because (1)

---

2. Mother's first assignment of error and Father's second assignment of error both present three issues for review. The second issue in Mother's first assignment of error and the third issue in Father's second assignment of error will be addressed separately later in the opinion.

- 12 -

Father completed his case plan and demonstrated he can meet Charlie's needs, and (2) the juvenile court improperly focused on Father's one-off statements (e.g., the "fucking useless" comment) when in fact "[Father's] actions are the complete opposite of his words." Father argues the juvenile court erred in determining that Charlie could not or should not be placed with him and that it was in Charlie's best interest to grant permanent custody to the Agency. Both parents argue that Charlie's need for a legally secure permanent placement could be achieved by granting legal custody to Father.

## A. Standard of Review

{¶ 32} The right to parent one's children is a fundamental right. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). R.C. 2151.414 authorizes a juvenile court to terminate parental rights and award permanent custody of a child to a children services agency. *In re V.T.*, 2026-Ohio-11, ¶ 32 (12th Dist.). Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the State bears the burden of proving by clear and convincing evidence that the statutory standards for permanent custody have been met. *Id*. Additionally, the State is required to prove that it made reasonable efforts to reunite parent and child during the child-custody proceedings prior to the termination of parental rights. *In re B.C.*, 2014-Ohio-4558, ¶ 26, citing R.C. 2151.419(A)(1).

{¶ 33} Because "R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11. "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the

evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re B.O.*, 2024-Ohio-1732, ¶ 37 (12th Dist.), citing *In re L.B.*, 2020-Ohio-3045, ¶ 29 (10th Dist.). When reviewing for manifest weight, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *In re V.T.* at ¶ 33. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.). We are especially mindful of this presumption in permanent custody cases. *In re V.T.* at ¶ 33.

**B. The Two-Part Permanent Custody Test**

{¶ 34} Before terminating parental rights and granting permanent custody of a child to a children services agency, R.C. 2151.414(B)(1) requires a juvenile court to make specific findings under a two-part test. First, using the factors set forth in R.C. 2151.414(D), the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child. *Id.* Second, under R.C. 2151.414(B)(1), the juvenile court must find that any one of the circumstances set forth in R.C. 2151.414(B)(1)(a)-(e) applies. This includes a circumstance, often referred to as the "12 of 22" provision, where the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period. *In re A.D.*, 2022-Ohio-736, ¶ 20 (12th Dist.), citing R.C. 2151.414(B)(1)(d). This also includes the circumstance that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a).

## C. Whether One of the Circumstances set forth in R.C. 2151.414(B)(1)(a)-(e) Applies

{¶ 35} As stated above, the juvenile court found that Charlie had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period prior to the Agency filing its motion for permanent custody. *See* R.C. 2151.414(B)(1)(d). The juvenile court also found that Charlie could not be placed with Mother or Father within a reasonable time or should not be placed with either of them pursuant to R.C. 2151.414(B)(1)(a). With respect to the 12 of 22 provision, temporary custody is deemed to begin on the date that the child is adjudicated abused, neglected, or dependent, or 60 days after the child's removal from the home, whichever occurs earlier. R.C. 2151.414(B)(1)(d); *In re B.T.*, 2025-Ohio-3019, ¶ 39 (12th Dist.). Here, the earlier date was the date 60 days after Charlie was removed from the home on September 30, 2023. Thus, Charlie is considered to have entered the Agency's temporary custody as of November 29, 2023. When the Agency moved for permanent custody on February 28, 2025, Charlie had been in the Agency's custody for almost 15 months. Mother does not dispute and Father expressly concedes the juvenile court's 12 of 22 determination, and the record supports the court's finding.

{¶ 36} In his first assignment of error, Father challenges the juvenile court's determination that Charlie could not be placed with him within a reasonable time or should not be placed with him. We need not review this issue. *In re B.T.* at ¶ 40. Only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the permanent custody test. *Id.* at ¶ 36*.* Because the juvenile court found that the "12 of 22 provision" had been satisfied under R.C. 2151.414(B)(1)(d), its "could not/should not be placed" finding under R.C. 2151.414(B)(1)(a) was unnecessary to grant permanent custody. *In re C.P.*, 2022-Ohio-3320, ¶ 27 (12th Dist.). Because Mother and Father do not challenge

- 15 -

the juvenile court's "12 of 22" finding and the record supports it, we affirm the juvenile court's decision regarding the second prong of the permanent custody test without conducting any further analysis. *In re B.T.* at ¶ 40. Father's first assignment of error is overruled.

{¶ 37} We now turn to the first prong of the permanent custody test–whether granting permanent custody to the Agency was in Charlie's best interest.

### D. Best-Interest Determination

{¶ 38} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 2014-Ohio-4558, at ¶ 26. Before granting permanent custody, the juvenile court is required to consider all relevant factors under R.C. 2151.414(D)(1). *Id.* These factors include (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7)-(11) applies in relation to the parents and child. *In re J.M.*, 2025-Ohio-1406, ¶ 29 (12th Dist.), citing R.C. 2151.414(D)(1)(a)-(e). No single factor under R.C. 2151.414(D)(1) is entitled to more weight than the others. *In re V.T.*, 2026-Ohio-11, at ¶ 38 (12th Dist.).

### 1. Interaction and Interrelationship

{¶ 39} The record shows that Father and Charlie are bonded and have a loving relationship, and that Charlie is always happy to see Father. However, from September 2023 to March 2025, Father did not always fully use his eight hours of visitation because

it was difficult to do so in a public place, attended only one of Charlie's therapies, did not attend Charlie's autism evaluation and IEP meeting and did not inquire afterward, and did not visit Charlie whenever he was in the hospital. That Father could not visit Charlie in his home was a direct result of his decision to resume living with Mother during most of the case despite the no-contact order. Father brought it upon himself. The record also indicates that Father reluctantly uses the G-tube to feed Charlie because he is required to do so.

{¶ 40} Charlie has resided with Foster Mother since early October 2023, a period of nearly two years. The record shows that Charlie has thrived and made significant developmental progress in the care of Foster Mother, that he is bonded with Foster Mother, and that she puts his needs first. Whereas Father did not engage with Charlie's therapies before March 2025, has never expressed a willingness to learn from the therapists, and has never requested to be part of Charlie's treatment team, Foster Mother was the one who had Charlie evaluated for autism, has always attended Charlie's therapies, and fully understands the importance of working with Charlie's team.

### 2. Charlie's Wishes

{¶ 41} R.C. 2151.414(D)(1)(b) gives the juvenile court the choice of considering the child's wishes directly from the child or through the guardian ad litem. *In re C.F.*, 2007-Ohio-1104, ¶ 55. Due to his age and disabilities, Charlie was unable to express his wishes. Instead, the juvenile court relied upon the CASA's recommendation. The CASA filed a written report three weeks before the permanent custody hearing and testified at the hearing. The CASA's report recommended that Charlie remain in the temporary custody of the Agency and that he be placed with Father fulltime following a slow transition. That is, the CASA's initial stance was to recommend an extension of temporary custody and granting Father more parenting time. However, upon hearing the testimony

of Father, Foster Mother, and the caseworker over three days of hearing, the CASA recognized that Father still did not fully understand Charlie's special needs, his developmental age, and his level of autism and that he was therefore not ready to assume custody of Charlie. Consequently, the CASA recommended that permanent custody be granted to the Agency.

### 3. Custodial History

{¶ 42} The juvenile court found that Charlie has been in the custody of the Agency since the beginning of the case and continues to be in its custody. By the last day of the permanent custody hearing, Charlie had been in the Agency's custody for close to two years. As this court recently observed, "While parents work toward reunification, children continue to grow, develop attachments, and need stability. Time for a child differs markedly from time for an adult. Two years represents a substantial portion of young children's lives," and Charlie here spent that formative period bonding to Foster Mother. *In re V.T.*, 2026-Ohio-11, at ¶ 47 (12th Dist.).

### 4. Need for Legally Secure Permanent Placement

{¶ 43} The juvenile court found that Charlie's need for a legally secure permanent placement could not be achieved without granting permanent custody to the Agency. In support of this finding, the court stated that Father "was given an opportunity to demonstrate he was capable of taking care of [Charlie] and all his special needs, but Father failed to convince anyone other than himself that he is ready." The court also stated that while Father has met several case plan objectives, he has not met "the most important one–to demonstrate that he understands all of [Charlie's] special needs and that he is capable of providing the type of care that [Charlie] needs."

{¶ 44} Both parents challenge the juvenile court's finding, arguing that Father has completed all his case plan requirements and was ready for reunification, and that the

juvenile court did not consider Father's "substantial progress on his case plan objectives."

{¶ 45} Although Father completed his case plan requirements regarding mental health and alcohol/drug assessments, stable employment and housing, and parenting classes, he did not complete all of them promptly. We have repeatedly held that the completion of case plan requirements does not preclude a grant of permanent custody. *In re V.T.*, 2026-Ohio-11, at ¶ 50 (12th Dist.). This is because a case plan is merely a means to a goal and not a goal in itself. *Id.* "The key concern is not whether the parent has checked boxes on a form, but whether the parent has substantially remedied the concerns that caused the child's removal." *Id.* A juvenile court's primary focus in a permanent custody proceeding is the child's best interest, therefore a parent could complete all the case plan goals and the juvenile court could still appropriately terminate their parental rights. *In re K.K.*, 2023-Ohio-400, ¶ 51 (12th Dist.).

{¶ 46} In the present case, Father has not demonstrated he can provide Charlie with a safe and stable environment tailored to his special needs or consistently provide for his basic needs. As this court has stated, parents are "afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re B.O.*, 2024-Ohio-1732, at ¶ 60 (12th Dist.).

{¶ 47} The Agency became involved with the family in late September 2023, 11 days after Father observed bruises on Charlie's body, photographed them to protect himself from accusation, and failed to report them or take Charlie to the hospital. Seventeen months elapsed between the day Charlie was removed from the family and the day the Agency moved for permanent custody. During that time period, Father chose to resume a relationship with Mother and live with her, despite the felony charges filed against her and her subsequent guilty plea to child endangering for abusing Charlie. Consequently, visitation could not take place at Father's home and Father rarely used his

full eight hours of visitation. Although he was aware of them and was encouraged to go, Father did not attend Charlie's surgeries and never visited Charlie whenever he was hospitalized. Although he was aware of them and was encouraged to go, Father did not attend Charlie's autism evaluation and his IEP meeting, and never inquired about the results of either meeting. For the most part, Father did not attend Charlie's therapies, was dismissive of them, and was critical of Charlie's diagnosis of food aversion and his using a G-tube for feeding and a speech device to communicate.

{¶ 48} It was not until March 2025, shortly after the Agency moved for permanent custody and three months before the permanent custody hearing, that Father started attending and became involved in all of Charlie's therapies and that he admitted they were beneficial to Charlie. Nonetheless, testimony revealed that Father grudgingly uses the G-tube to feed Charlie, that he does not fully understand Charlie's special needs and his level of autism and what it takes to care fulltime for Charlie, and that he continues to have unrealistic expectations of Charlie's capabilities. Testimony also revealed that Father still believes Mother did not cause Charlie's injuries, that he does not have a daycare and childcare plan in place to accommodate his work schedule, and that he anticipates using Maternal Grandparents for child care despite the concerns regarding them and the fact they are in contact with Mother. Moreover, concerns regarding Father's ability to provide a safe and stable environment for Charlie were not alleviated given his testimony that he disagrees with a potential no-contact court order regarding Maternal Grandparents, and that if he gets legal custody of Charlie, how he will set up childcare will no longer be the Agency's concern.

{¶ 49} The phrase "legally secure permanent placement" connotes more than a roof over the children's heads. It encompasses stability, both material and emotional; consistency in meeting the children's needs; and the reasonable assurance that such

stability will endure. *In re V.T.*, 2026-Ohio-11, at ¶ 55 (12th Dist.). Here, the evidence does not paint a picture of continuing parental stability. Against this backdrop, Charlie's placement with Foster Mother offered genuine security. Foster Mother has expressed her desire to adopt Charlie who has bonded with her over two years. Charlie is thriving in her care and the stable and secure environment she provides, and is progressing developmentally.

### 5. Factors in R.C. 2151.414(E)(7)-(11)

{¶ 50} In considering R.C. 2151.414(D)(1)(e), the juvenile court held that "there are no other factors in [R.C. 2151.414(E)(7)-(11)] that apply to this case beyond what was enumerated in the [court's discussion of the 'could not/should not be placed' finding]." Under that discussion, the court only specifically cited the (E)(10) factor–that Mother had abandoned Charlie. The factors in R.C. 2151.414(E)(7)-(11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's repeatedly withholding medical treatment or food from the child; a parent's repeatedly placing the child at a substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102, ¶ 19. None apply to Father.

### E. Time's Up

{¶ 51} A child's life is not something the juvenile court should take a gamble on, no matter how good the odds may seem. *In re V.T.*, 2026-Ohio-11, at ¶ 59 (12th Dist.). "Children are not experiments in parental rehabilitation. The law does not require the court to test whether children will suffer great detriment or harm before protecting them." *Id.*

{¶ 52} Father was given ample opportunity and time to prove he could adequately provide for Charlie and his special needs. Father, however, failed to demonstrate he can

provide a safe and stable environment that is tailored to Charlie's needs and capabilities and dedicated to Charlie achieving his potential. The fact that Father may have finally embraced Charlie's therapies and treatment for three months before the permanent custody hearing is simply too little, too late. The juvenile court, just like this court, must act in a manner that places Charlie's best interests above all else. The juvenile court's decision to grant permanent custody of Charlie to the Agency does just that. Therefore, the juvenile court did not err in finding that granting permanent custody to the Agency was in Charlie's best interest. Mother's second assignment of error is overruled.

{¶ 53} We now turn to the parties' remaining issues for review.

**F. The Juvenile Court's Consideration of All the Evidence Presented**

{¶ 54} In her first assignment of error, Mother also questions whether the juvenile court truly weighed all the evidence presented when, during the second day of the permanent custody hearing, it did not remember the daycare employee's testimony that she had photographed Charlie's bruises and that Maternal Grandmother had asked the daycare not to report Mother. This issue lacks merit. The record shows that during the caseworker's testimony, the court was momentarily confused regarding who had photographed Charlie's bruises, when the Agency became aware of the daycare employee's photographs, and whether the daycare had reported the bruising to the Agency. With clarification from the prosecutor, the juvenile court then correctly summarized the caseworker's testimony as follows: "the bruising happened, perhaps, two weeks before. Dad noticed it, took photos. Daycare noticed it and took photos. No report was made to the Agency, but after the injuries to [Charlie] this time, this is when it all came out." In its decision granting permanent custody to the Agency, the juvenile court correctly stated that the daycare employee took photographs of the bruising on Charlie's body, that Father also photographed the bruising, and that neither the daycare nor Father

reported the bruising.

{¶ 55} In light of all of the foregoing, Mother's first assignment of error is overruled.

### G. The Agency's Reasonable Reunification Efforts

{¶ 56} In his second assignment of error, Father also argues that the Agency did not make a reasonable effort to reunify him with Charlie. Father generally asserts he "does not believe" that "the Agency was in favor of aiding him in securing services for [Charlie], daycare/schooling, allowing him to attend visits or increasing his parenting time," or that "the Agency made reasonable efforts to aid him in relieving their final concerns they may have had with Father." During the permanent custody hearing, Father summarily testified that the Agency did not help accommodate Father's visitation when the Agency refused his offer that Mother leave their apartment when he had visitation.

{¶ 57} In a permanent child custody matter, the State is required to "make reasonable efforts to reunify the family during child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.*, 2007-Ohio-1104, at ¶ 43. "Reasonable efforts" are "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." *Id.* at ¶ 22, quoting Will L. Crosley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003).

{¶ 58} In determining whether an agency made reasonable efforts to reunify the family during the custody proceedings, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard. *See In re A.B.*, 2022-Ohio-4716, ¶ 18 (12th Dist.). "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service,

- 23 -

no matter how remote, may have made reunification possible." *Id.*

{¶ 59} The record shows that the juvenile court made reasonable efforts findings on several occasions. A reasonable efforts finding was made following the adjudication hearing. The magistrate also made a reasonable efforts finding following several review hearings. The record also reflects that the Agency made reasonable efforts to reunify Father with Charlie through the creation of the case plan. Father never challenged the juvenile court's multiple reasonable efforts determinations in the underlying proceedings or otherwise expressed to the juvenile court that the Agency was failing to make reasonable efforts to facilitate his reunification with Charlie. Father should not be heard to do so now.

{¶ 60} Father's second assignment of error is overruled.

**H. Extension of Temporary Custody**

{¶ 61} Mother's Assignment of Error No. 3:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY WHEN IT HAD THE OPTION TO GIVE [FATHER] AN EXTENSION TO PROVE HE IS CAPABLE OF CARING FOR [CHARLIE].

{¶ 62} R.C. 2151.415(D)(2) provides that a juvenile court may order a second extension of temporary custody of up to six months if it determines by clear and convincing evidence that (1) the additional extension is in the best interests of the child, (2) there has been substantial additional progress on the case plan since the original extension of temporary custody in the case plan of the child, (3) there has been substantial additional progress since the original extension of temporary custody toward reunifying the child with one of the parents or otherwise permanently placing the child, and (4) there is reasonable cause to believe the child will be reunified with one of the parents or otherwise permanently placed within the period of extension. Notably, the

statute provides only that the juvenile court may extend the temporary custody order, not that it must do so. Thus, a juvenile court's decision to grant or deny an extension of temporary custody is reviewed under an abuse of discretion standard. *In re H.G.*, 2015-Ohio-1764, ¶ 20 (12th Dist.).

{¶ 63} There was no motion for a second extension of temporary custody pending before the juvenile court for consideration. At the permanent custody hearing, the parties waived opening statements, and there was no oral motion to extend temporary custody raised prior to the presentation of the parties' cases-in-chief. In closing argument, Father's attorney twice referred to a second extension of temporary custody, essentially claiming there was time left in the custody proceedings to grant such extension. However, he did not expressly request a second six-month extension of temporary custody, mention R.C. 2151.415(D)(2), or argue he had proved the four statutory requirements by clear and convincing evidence. *In re H.B.*, 2025-Ohio-5090, ¶ 39 (9th Dist.). Furthermore, the juvenile court's finding that granting permanent custody to the Agency was in Charlie's best interest necessarily implied that an extension of temporary custody was not. *In re H.G.* at ¶ 24; *In re G.B.*, 2017-Ohio-8759, ¶ 28 (2d Dist.).

{¶ 64} In light of the foregoing, the juvenile court did not err by failing to extend the Agency's temporary custody of Charlie for an additional six months. Mother's third assignment of error is overruled.

### III. CONCLUSION

{¶ 65} Upon thoroughly reviewing the record, we find the juvenile court did not err in granting the Agency permanent custody of Charlie. This is because, as discussed fully above, the juvenile court's decision to grant permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 66} Judgment affirmed.

BYRNE, P.J., and SIEBERT, J., concur separately and jointly.

**BYRNE, P.J., and SIEBERT, J., concurring separately and jointly.**

{¶ 67} Given the evidence presented before the juvenile court and given the standard of review applicable in cases like this one, we conclude that we must affirm the juvenile court's permanent custody decision. *In re V.T.*, 2026-Ohio-11, ¶ 33 (12th Dist.) (holding that manifest-weight-of-the-evidence review applies but if the evidence is susceptible to more than one construction, deference must be given to trier of fact). We therefore join our court's lead opinion. However, we write separately to note that this is a very close case, and if either of the judges joining this concurring opinion acted as the trial court judge, the Agency might not have been granted permanent custody. While there is sufficient evidence in the record to affirm the juvenile court's award of permanent custody to the agency, there is also significant evidence in Father's favor.

{¶ 68} In particular, our votes to affirm should not be read to suggest that a parent can *never* object to, criticize, or even refuse to participate in certain medical or therapeutic endeavors recommended by a child's medical providers or therapists. Such actions may sometimes be appropriate. Parents are responsible for their child's life and health. The recommendations of medical and therapeutic providers must of course be given some weight, but such providers are fallible, and parents may have knowledge about their child's particular circumstances that is superior to such providers' knowledge.

{¶ 69} The providers in this case seem to have developed a negative attitude toward Father because he initially criticized or did not see the value in their methods. Parents have the right to express or hold opinions about the appropriate care or treatment of their children. In fact, Father surely had more exposure to Charlie than did any of Charlie's providers, and it is concerning that those providers may have simply disregarded Father's statements about Charlie's progress at home. In cases involving disputes

- 26 -

between parents and medical professionals regarding health or development issues, the state may not simply rely on the recommendations of those professionals as if they are unquestionable, to the exclusion of the reasonable assessments and opinions of parents.

{¶ 70} That being said, the evidence regarding Father's initial disagreement with Charlie's recommended therapies is not the only evidence in this case potentially supporting the juvenile court's permanent custody decision. That additional evidence includes evidence that could lead the juvenile court to conclude that Father was likely to reunite Charlie with Mother (his abuser) after her release from prison, that Charlie's therapies were indeed necessary, and that Father only participated in Charlie's therapies to assuage the agency and court until he regained custody and was otherwise potentially misleading about his intentions. Based on the overall weight of the evidence, we cannot reverse the juvenile court and we join our court's lead opinion.

## JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge

- 27 -